**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| ETHAN MCROREY, KAYLEE FLORES, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| MERRICK B. GARLAND, in his Official Capacity as Attorney General of the United States, and the FEDERAL BUREAU OF INVESTIGATION, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs, Ethan McRorey ("McRorey"), Kaylee Flores ("Flores"), Gun Owners of America, Inc. ("GOA"), and Gun Owners Foundation ("GOF") (collectively "Plaintiffs"), by and through undersigned counsel, and allege as follows:

### INTRODUCTION

1.      This case involves a challenge to 18 U.S.C. § 922(t)(1)(C) and 34 U.S.C. § 40901(l) (the "Challenged Provisions"), which were enacted by Congress and signed by the President on June 25, 2022 as part of the so-called "Bipartisan Safer Communities Act," Pub. L. No. 117-159, 136 Stat. 1313. The Challenged Provisions took effect on November 14, 2022 and mandate an automatic, nationwide, indefinite waiting period on *every* prospective firearm purchaser who is at least 18 years of age but under 21 years of age, delaying the exercise of and thereby infringing the right to keep and bear arms for this entire category of "the people." The Challenged Provisions also depend upon the federal government seeking and receiving responses from local law

enforcement and numerous state agencies throughout the nation, mandating that the federal National Instant Background Check System ("NICS") contact such entities to request burdensome investigations into *every* prospective firearm transfer from a licensed dealer to an adult under the age of 21. Plaintiffs seek a temporary restraining order and preliminary injunction halting enforcement and any further implementation of this patently unconstitutional enactment, until a decision on the merits can be reached. Plaintiffs further seek permanent injunctive and declaratory relief finding that the Challenged Provisions are violative of the Second and Fifth Amendments to the United States Constitution.

## I.      PARTIES

2.      Plaintiff Ethan McRorey is a natural person, a citizen of the United States and of the State of Texas, and resides in Montague County, Texas, within this district. McRorey is 20 years old and is a law-abiding person who is eligible to possess firearms in the State of Texas and eligible to purchase shotguns and rifles under federal law.

3.      Plaintiff Kaylee Flores is a natural person, a citizen of the United States and of the State of Texas, and resides in Taylor County, Texas, within this district. Flores is 19 years old and is a law-abiding person who is eligible to possess firearms in the State of Texas and eligible to purchase shotguns and rifles under federal law.

4.      Plaintiff GOA is a California non-stock corporation with its principal place of business in Springfield, Virginia. GOA's mission is to preserve and defend the inherent Second Amendment rights of gun owners. GOA has over 2 million members and supporters, including tens of thousands in Texas, including within this district, and operates as a nonprofit organization exempt from federal income taxes under Section 501(c)(4) of the Internal Revenue Code ("IRC"). Many of GOA's members and supporters, like McRorey and Flores, are law-abiding young adults

under the age of 21.  Many of these gun owners and would-be gun owners, like the individual Plaintiffs herein, are being and will continue to be irreparably harmed by the Challenged Provisions.

5.      Plaintiff GOF is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia.  GOF is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under § 501(c)(3) of the IRC. GOF is supported by gun owners across the country, including within Texas and within this district.  GOF's supporters include young adults who, like the individual Plaintiffs herein, are being and will continue to be irreparably harmed by the Challenged Provisions.

6.      Prior to the filing of this case, GOA and GOF have heard from numerous of their members and supporters, including young adults, about how these persons are being and will continue to be irreparably harmed by the challenged statute.  *See* Declaration of Megan Browning, Exhibit 1, ¶7.  Indeed, GOA and GOF have communicated with members and supporters in dozens of states across the country, identifying specific individuals who are being or will be irreparably harmed by the challenged provisions.  *Id*. ¶9.  As just one example, one of GOA's members in Indiana recently waited 18 days before finally being granted permission by the FBI to exercise his enumerated right to acquire a firearm.  *Id*. ¶10; *see also* Declaration of Hayden Haines, Exhibit 8.

7.      Together, GOA and GOF represent the interests of thousands of members and supporters who are actual and potential firearm purchasers affected by the Challenged Provisions. Both GOA and GOF have standing because (a) each of their members between the ages of 18 and 20 would have standing to sue individually to challenge the Challenged Provisions; (b) the interests GOA and GOF seek to protect are germane to their organizational purposes; and (c) neither the

claims asserted, nor the relief requested, require the participation of individual members and supporters in the lawsuit.

8.      Defendant Merrick B. Garland is sued in his official capacity as the Attorney General of the United States ("Attorney General"). The Attorney General is a necessary and proper party because the Attorney General is the official identified, in and throughout the statutory scheme at issue, as having the duty and authority to implement, administer, and enforce the Challenged Provisions.

9.      Defendant Federal Bureau of Investigation ("FBI") is a law-enforcement component of the Department of Justice, tasked with enforcement of the Challenged Provisions through its operation of NICS with respect to firearm purchases.  By its implementation of the Challenged Provisions and its operation of the NICS system, Defendant FBI has kept Plaintiffs from acquiring firearms, thereby infringing their Second Amendment rights.

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 2201, and 2202.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.      STATEMENT OF FACTS

### A.      The Statutory Scheme.

12.     Effective November 30, 1993, Congress enacted and President Clinton signed into law the so-called "Brady Handgun Violence Prevention Act," Pub. L. No. 103-159, 107 Stat. 1536, ("Brady Act"), which took effect on February 28, 1994.

13.     Among its other provisions, the Brady Act mandated the creation, within 5 years of its passage, the NICS system for conducting background checks on persons seeking to purchase

4

firearms from licensed dealers, with the intent of facilitating "instant" approval or denial of transfers to prospective purchasers.[1]

14.     After the effective date of the Brady Act and, prior to the NICS system coming online in November of 1998, the Brady Act purported to require chief law enforcement officers ("CLEOs"), typically local sheriffs or police chiefs who were not federal employees, to conduct background investigations of all prospective handgun purchasers within each respective CLEO's jurisdiction, during a 5-business-day "waiting period" implemented by the Brady Act.

15.     In *Printz v. United States*, 521 U.S. 898 (1997), the Supreme Court held unconstitutional this interim federal mandate upon local CLEOs to conduct background checks on handgun purchasers as violative of the Tenth Amendment. The *Printz* decision made clear that the federal government, through a statute or otherwise, cannot commandeer local officials and force them to perform background investigations on prospective gun purchasers.

16.     The NICS system became operational in November of 1998 and, since then, has been anything but reliable – let alone "instant."  As the FBI points out, the NICS system quickly approves proposed transferees and authorizes firearm transfers – *most of the time*.[2]  In reality, this "instant" check is often anything but, even for purchasers over the age of 21, who are not subject to the Challenged Provisions. For instance, only 85.30% of transactions in 2020 were "instant"

---

[1] In reality, this "instant" check is often anything but "instant," even for purchasers over the age of 21, who are not subject to the Challenged Provisions. For instance, only 85.30% of transactions in 2020 were "instant" and 87.98% were "instant" in 2021.  *See* https://www.fbi.gov/file-repository/nics-2020-2021-operations-report.pdf/view, at 3.

[2]  *See*  https://www.fbi.gov/news/testimony/national-instant-criminal-background-check-system-nics  (In 2017, the FBI reported that "[o]ver 70 percent of NICS transactions handled by the FBI result in no descriptive matches or hits to the potential transferee against information contained in the three national databases," and NICS has "an 'immediate determination' rate of over 90 percent to the firearms dealer.").

and 87.98% were "instant" in 2021.[3]  Of course, when it comes to the number of "instant" background checks that are not, in fact, instant, a small percentage of a large number is itself a large number.  In 2021, for example, the FBI reports that it ran nearly 39 million NICS checks, for a total of more than 411 million NICS checks since the system began in November of 1998.[4]  At a reported 12 percent "delayed" rate, a total of 39 million NICS checks in the past year means that there were roughly 4.7 million "delayed" results from the FBI (more than the population of Louisiana).  What is more, it would appear that about 90 percent of these "delayed" results are eventually determined to be false positives,[5] because GAO estimates that only about one percent of total NICS checks[6] result in denials to a person the FBI *believes to be*[7] a prohibited person.

17.    The NICS system also experiences system outages, during which periods the system simply does not work – at all. From February 4, 2019 to February 5, 2021, there were at least 17 recorded "outages" of NICS, ranging in duration from 6 minutes to over 5 hours. *See* Exhibit 2.  What is more, many states (19 of them) operate as partial or full "point of contact"

---

[3] *See* https://www.fbi.gov/file-repository/nics-2020-2021-operations-report.pdf/view, at 3.

[4] *See* https://www.fbi.gov/file-repository/nics-2020-2021-operations-report.pdf/view.

[5] In reality, the FBI does not actually bother to investigate and clear many "delayed" NICS results. In fact, it is reported that "[t]he FBI never completes hundreds of thousands of gun background checks each year...." https://www.rollcall.com/2019/12/03/fbi-never-completes-hundreds-of-thousands-of-gun-checks/.

[6] https://www.gao.gov/assets/700/694290.pdf, at 1.

[7] Even among "denied" NICS checks, a large percentage are based on inaccurate records or improper legal determinations as to what constitutes a prohibiting factor under federal law (such as what constitutes a misdemeanor crime of domestic violence).  In such a case of an erroneous denial, the burden then falls upon the person wrongly denied to file a NICS Appeal and prove to the FBI or referring state or local agency that he is not, in fact, a prohibited person.  The FBI acknowledges that it often reverses its denials – as frequently as 27.7 percent of the time.  Exhibit 3.  And if the FBI refuses to admit error and *still* improperly refuses to correct a record, such a person must then hire an attorney to sue under 18 U.S.C. § 925A to force the FBI to correct the system.  *See, e.g.*, Complaint, *Bickett v. United States*, 1:17-cv-01276-CRC (D.D.C. June 28, 2017).

("POC") states that handle firearm background checks,[8] and contact the FBI as intermediaries to have a NICS check performed on prospective firearm purchasers. If those states' systems experience outages themselves, then no NICS check can be performed during those periods as well. In other words, for POC states, both federal and state systems must work concurrently.

18.     On June 25, 2022, President Biden signed into law the so-called "Bipartisan Safer Communities Act," Pub. L. No. 117-159, 136 Stat. 1313. A copy of this statute is attached hereto as Exhibit 4 ("BSCA"). The BSCA includes the Challenged Provisions.

19.     Adding to the burdens already created by the unreliable and often incorrect NICS system, the newly enacted 18 U.S.C. § 922(t)(1)(C) provides the following prerequisites for firearm transfers to those under the age of 21:

> *(C) in the case of a person less than 21 years of age, in addition to all other requirements of this chapter—*
>
> > *(i) the system provides the licensee with a unique identification number;*
> >
> > *(ii) 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that cause exists to further investigate a possibly disqualifying juvenile record under subsection (d); or*
> >
> > *(iii) in the case of such a person with respect to whom the system notifies the licensee in accordance with clause (ii) that cause exists to further investigate a possibly disqualifying juvenile record under subsection (d), 10 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that—*
> >
> > > *(I) transferring the firearm to the other person would violate subsection (d) of this section; or*
> > >
> > > *(II) receipt of a firearm by the other person would violate subsection (g) or (n) of this section, or State, local, or Tribal law;*

---

[8] https://www.fbi.gov/file-repository/nics-participation-map.pdf.

20.     In order to implement this so-called "enhanced background check" on firearm purchasers under the age of 21 required by 18 U.S.C. § 922(t)(1)(C), the BSCA further amended the Brady Act to add 34 U.S.C. § 40901(l), which provides as follows:

*(l) Requirements relating to background checks for persons under age 21*

*If a licensee contacts the system established under this section regarding a proposed transfer of a firearm to a person less than 21 years of age in accordance with subsection (t) of section 922 of title 18, the system shall—*

*(1) immediately contact—*

> *(A)  the criminal history repository or juvenile justice information system, as appropriate, of the State in which the person resides for the purpose of determining whether the person has a possibly disqualifying juvenile record under subsection (d) of such section 922;*

> *(B)  the appropriate State custodian of mental health adjudication records in the State in which the person resides to determine whether the person has a possibly disqualifying juvenile record under subsection (d) of such section 922; and*

> *(C)  a local law enforcement agency of the jurisdiction in which the person resides for the purpose of determining whether the person has a possibly disqualifying juvenile record under subsection (d) of such section 922;*

*(2) as soon as possible, but in no case more than 3 business days, after the licensee contacts the system, notify the licensee whether cause exists to further investigate a possibly disqualifying juvenile record under subsection (d) of such section 922; and*

*(3) if there is cause for further investigation, as soon as possible, but in no case more than 10 business days, after the licensee contacts the system, notify the licensee whether—*

> *(A)  transfer of a firearm to the person would violate subsection (d) of such section 922; or*
> *(B) receipt of a firearm by the person would violate subsection (g) or (n) of such section 922, or State, local, or Tribal law.*

21.     These two new statutory provisions, collectively the "Challenged Provisions," require, prior to the transfer of a firearm, an affirmative inquiry by the NICS system to, and receipt of a response from, at least three separate state and local officials or agencies: (i) the state repository for juvenile justice records, (ii) a state repository for mental health records (to the extent a state even has such a central clearinghouse), and (iii) a CLEO.  The Challenged Provisions then require the NICS system to inform the licensee (dealer) as to *whether* the transfer of the firearm may occur, based upon these inquiries.

22.     Worded as they are by Congress, the Challenged Provisions do not appear to directly impose any *mandate* on state and local officials to investigate or respond at all, presumably because Congress is aware that such a mandate would violate the Tenth Amendment as described in the *Printz* decision. Yet the Challenged Provisions do mandate that the NICS system affirmatively determine and inform every firearm dealer, for every purchase by someone under 21, whether – a definite affirmation of the "yes" or "no" alternatives – the purchaser has a state or local record which would prevent the transfer of a firearm.

23.     The Challenged Provisions do not appear to provide any guidance as to what happens to a prospective transfer if one or more of the three state or local offices simply fails or refuses to provide a response. If the NICS system cannot ascertain whether a disqualifying or potentially disqualifying record exists after inquiry to all three categories of state and local officials, then the statute cannot be followed as written, as it requires that the NICS system determine and inform the licensee (dealer) as to whether any disqualifying juvenile or mental health record exists for the prospective purchaser.

24.     The problem of a state or local agency refusing or failing to respond to an inquiry from the NICS system is not merely theoretical. In fact, it is so common that the FBI has previously

created a detailed "Standard Operating Procedure" addressing the issue of NICS inquiries to state and local agencies, entitled "SOP 5.5.5 External Research" (the "SOP"). A copy of the SOP is attached as Exhibit 5.

25.     Detailing procedures to follow when the NICS system has incomplete or unclear records, and further what information must be obtained from state and local authorities, the SOP provides that "every effort must be made" by NICS to attempt to obtain a response from a state or local agency, but provides further that certain agencies are flagged to be contacted only as a "last resort" if others do not respond. The SOP also states that NICS maintains a listing of agencies which either charge a fee for inquiries or that simply refuse to respond at all to NICS inquiries, and instructs NICS examiners not to contact such entities at all.

26.     The FBI's own SOP, then, openly acknowledges the issue created by the Challenged Provisions – that the NICS system often does not, and in some cases cannot, receive any response from some state and local agencies. Under the plain language of the Challenged Provisions, if the NICS system cannot affirmatively determine whether a prospective purchaser under the age of 21 has a disqualifying record, then the transfer of a firearm to such a purchaser cannot ever be approved.

27.     Under the Challenged Provisions, then, the dealer is left with the decision whether to exercise its discretion to transfer the firearm – after 3 business days (if no "further cause" is found), or after 10 business days (if "further cause" is found but not resolved by NICS).  If the dealer declines to transfer the firearm even when permitted (but not required) to do so, then the young adult purchaser is delayed indefinitely, pending a NICS determination that will never arrive.

28.     Indeed, many Federal Firearms Licensees have a policy not to transfer *any* firearm until receiving an affirmative "approved" notification from NICS, regardless of how many days

have elapsed. This includes the nation's largest retailer, Walmart,[9] as well as numerous other large and small dealers.[10]

29.     Read in isolation, the newly created 18 U.S.C. § 922(t)(1)(C) *could* be seen as allowing for the possibility of a rapid or near-"instant" approval from the NICS system for a purchaser under the age of 21, as the three parts (unique transaction number, 3-day period, 10-day period) are stated in the disjunctive.  In other words, if NICS requested and received responses from all three state entities contemporaneously, or nearly so, then the FBI would be in a position to provide a "proceed" response in less than three business days.

30.     Nevertheless, the FBI has already made clear that, as of November 14, 2022, **every** firearm purchaser under the age of 21 **will be automatically delayed** in receiving a response from the NICS system, up to 10 business days.

31.     Because the NICS system – which, as its name implies, was intended to be an ostensibly "instant" system by utilizing a *single centralized clearinghouse of indices* maintained and operated by the Federal Bureau of Investigation – must now send three separate inquiries to different state and local agencies *and* await their responses, the NICS system will now automatically and preemptively delay ALL transactions submitted for prospective purchasers under the age of 21, for an indefinite period of time.

---

[9]     *See Walmart Statement on Firearms Policy*, Walmart (Feb. 28, 2018), https://corporate.walmart.com/newsroom/2018/02/28/walmart-statement-on-firearms-policy.
[10]    *See, e.g., Firearm Purchase Info*, Kittery Trading Post, https://www.kitterytradingpost.com/customer-service/firearm-purchase-info.html (A large dealer in Maine noting that, "[f]or all firearm sales and transfers, the Kittery Trading Post elects not to release any firearm(s) until it obtains a 'proceed' from the bureau associated with any firearms background check.").

32.     The FBI NICS website (https://nicsezcheckfbi.gov), which provides information to dealers using the NICS system, recently provided a preemptive warning of the automatic delays to be implemented, as set forth in the alert copied below:

**ATTENTION**

**As a result of the passage of the Bipartisan Safer Communities Act (BSCA) of 2022, signed into law on June 25, 2022, the NICS Section has been working towards the implementation of an enhanced background check process for persons between the ages of 18-20. The enhancement provides the opportunity for additional outreach and research to be conducted regarding the existence of any juvenile adjudication information and/or mental health prohibition. As a result, transactions on persons between the ages of 18-20 will initially be delayed and the address of the individual will be collected so that the appropriate local and state entities may be contacted. The enhanced process will begin on November 14, 2022, for all transactions on persons under the age of 21 as previously described. Checks on persons under the age of 21 could be extended for a period up to ten business days. Therefore, it is possible for an FFL to be contacted with an updated Brady Transfer Date. As a temporary measure and until the NICS can be updated to provide this information electronically, NICS staff will be calling FFLs to advise of any change in the transfer date. In preparation for calls from NICS, you will be asked to verify your license number and code word. You may wish to have this information readily available for you and your staff.**

33.     The result of the Challenged Provisions is that <u>all</u> persons under 21 years of age who wish to purchase a firearm from a licensed dealer are <u>automatically delayed</u> by a supposedly "instant" check system, for an indefinite period up to at least 10 business days or possibly longer, while the NICS system sends inquiries to three different state and local agencies in the hopes that all three will respond, and respond in a timely fashion (while knowing that many will not respond timely and that some will never respond). Yet until all three state agencies respond, the Challenged Provisions do not allow a purchase to be approved – irrespective of the 3- and 10-day timelines therein – because the NICS system has an affirmative duty under the Challenged Provisions to determine <u>whether</u> a disqualifying juvenile or mental health record exists.

34.     The result of the Challenged Provisions is that *all* adults under the age of 21 are *at minimum* automatically delayed their right to purchase a firearm solely because of their age.

Potentially, under the Challenged Provisions, such a person could be indefinitely denied their right to acquire a firearm, in the event that even one of three state or local agencies, none of which have any duty or obligation to respond, fails or refuses to provide a response to the NICS system, and the firearms dealer refuses to transfer the firearm after 3 or 10 business days.  Of course, even a right delayed is a right denied, and the Challenged Provisions clearly infringe Plaintiffs' right to keep and bear arms.

### B.   The Second Amendment.

35.   The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

36.   In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia.  *Heller*, 554 U.S. at 581.  Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation.  *Id.* at 592.

37.   Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment.  *Id*. at 791.

38.   In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that

constitute bearable arms, even those that were not in existence at the time of the founding" and
that this "Second Amendment right is fully applicable to the States." *Id.* at 411, 416.

39.     As the Supreme Court has now explained in *N.Y. State Rifle & Pistol Ass'n v.
Bruen*, 142 S. Ct. 2111 (2022), "[t]o justify [a] regulation, the government may not simply posit
that the regulation promotes an important interest. Rather, the government must demonstrate that
the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a
firearm regulation is consistent with this Nation's historical tradition may a court conclude that the
individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2126
(citation omitted).

40.     In reviewing the historical evidence, the *Bruen* Court cabined review of relevant
history to a narrow time period, because "not all history is created equal," focusing on the period
around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but
noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have
generally assumed that the scope of the protection applicable to the Federal Government and States
is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791").
*See Bruen*, 142 S. Ct. at 2119–37 (discussing the lack of relevant historical prohibitions on carrying
firearms in public).

41.     With respect to whether post-founding historical sources have any role *at all* to play
in the analysis, the Supreme Court technically left the question open, finding it unnecessary to its
decision in *Bruen*.  142 S. Ct. at 2138.  Nevertheless, as the Court has repeatedly made clear, even
prior to *Bruen*, that Reconstruction-era historical sources are to be used (at most) only *as
confirmation* of a historical tradition that was already in existence during the founding.  For
example, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), the Court

14

rejected the fact that "more than 30 States" had enacted a certain type of legislation in the mid-to-late 19th century, explaining that even such a pattern "cannot by itself establish an early American tradition." *Id.* at 2258-59; *see also Bruen*, 142 S. Ct. at 2137 (using 1800s sources only "as mere confirmation of what the Court thought already had been established"); *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.  On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020).

42.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed."  Period.  There are no "ifs, ands or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's ostensible justification for, or interest in, infringing the right may be.  It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) upon the Second Amendment.  There is no "balancing" or "multi-step" test, and there are no relevant statistical studies to be consulted.  There are no sociological arguments to be considered.  The historically ubiquitous problems of crime, or the differing brain chemistry of younger adults, do not affect the equation and do not alter the Second Amendment's "unqualified command" as described by *Bruen*.  "The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller,* 554 U.S. at 634.

43.     The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second

Amendment in 1791, and *perhaps* during ratification of the Fourteenth Amendment in 1868. *Bruen*, 142 S. Ct. at 2138.

44.     Lest there be any doubt, the Supreme Court has also instructed as to the scope of the protected persons, arms, and activities covered by the Second Amendment. *Heller* explained that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.  *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

45.     Simply put, all "ordinary, law-abiding, adult citizens … are part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134.  A number of courts – including this Court in a recent opinion – have expressly held that 18-to-20-year-olds are among "the people" to whom the Second Amendment applies. *See Firearms Pol'y Coal., Inc. v. McCraw*, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) (holding that 18-to-20-year-olds are included in "the people" to whom the Second Amendment applies based upon both the text and the history of the Second Amendment and invalidating a Texas statute prohibiting such persons from carrying handguns outside the home); *see also Worth v. Harrington*, 2023 U.S. Dist. LEXIS 56638, at *21–22 (D. Minn. Mar. 31, 2023) ("the text of the Second Amendment includes within the right to keep and bear arms 18-to-20-year-olds, and therefore, the Second Amendment 'presumptively guarantees [Plaintiffs'] right to "bear" arms in public for self-defense.'"); *Beeler v. Long*, No. 21-cv-152 (KAC/DCP), ECF #50 (E.D. Tn. Apr. 26, 2023) (settlement agreement,

with Tennessee conceding that state law, which prohibited public carry to young adults between the ages of 18 and 21, violates the Second And Fourteenth Amendments.)

46.     Plaintiffs in this case are, or represent the interests of, law-abiding young adults between the ages of 18 and 21.  Such persons undoubtedly are part of "the people" the Second Amendment protects.  That is hardly surprising, as this age bracket traces its roots to the Revolutionary War, where "[t]he official enlistment age for the Continental Army was 16, (15 with parental consent) but soldiers could sign on up to the age of 55."[11]  On May 8, 1792, just a few months after the Second Amendment was ratified, the Second Militia Act, 1 Stat. 271, narrowing the historical age range slightly, providing that "every free able-bodied white male citizen … who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia."  In *Heller*, the Supreme Court confirmed this understanding, citing with approval a Georgia case which found that "[t]he right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree." *Heller*, 554 U.S. at 612 (quoting with approval *Nunn v. State*, 1 Ga. 243, 251 (1846)).

47.     Next, there is no debate that the firearms sought to be purchased by young adults in this case (shotguns and rifles) are quintessential "arms" protected by the Second Amendment.

48.     Finally, in order to engage in the protected activities of "keeping" and "bearing" firearms, weapons first must be acquired.  It is beyond serious debate that the right "to keep and bear" thus protects the corresponding right to purchase firearms, just as the freedoms of speech and press protect the right to purchase books, paper, and ink.  Indeed, it would not mean much if

---

[11]   https://historyofmassachusetts.org/continental-soldiers-revolutionary-war/.

there was a right to purchase a firearm, but no right to sell one. Multiple courts have held as much, such as the Seventh Circuit which opined that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *see also United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5 (W.D. Tex. Jan. 9, 2023) ("The clear answer is that 'keep and bear arms' includes receipt.").

49.     Thus, this case involves persons, arms, and conduct that "the Second Amendment … presumptively protects." *See Bruen*, 142 S. Ct. at 2129–30.

50.     To be sure, in *Heller* the Supreme Court identified a non-exhaustive list of "presumptively lawful regulatory measures" that included "laws imposing conditions and qualifications on the commercial sale of arms." *Heller,* 554 U.S. at 625–27. Sales to young adults was *not* on the list. But even so, "not every regulation on the commercial sale of arms is presumptively lawful." *Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375, at *14 (D. Del. Sept. 23, 2022). Moreover, the Supreme Court never said that even such statutes are conclusively lawful; nor did the Court exempt such statutes from critical analysis under the *Bruen* framework, which applies across-the-board to all challenges to regulations of conduct within the scope of the Second Amendment.

51.     Prior to *Bruen*, some courts upheld certain commercial regulations (such as bans on possession by certain classes of persons like felons), finding that they "comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear

arms." *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 343 (3d Cir. 2016) (*en banc*); *see also Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. In *United States v. Marzzarella*, the Third Circuit explained that "[i]n order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition." 614 F.3d 85, 91 n.8 (3d Cir. 2010). After *Bruen*, however, a historical inquiry must be conducted.

52. Even if certain "conditions and qualifications" on the sale of arms were somehow lawful without a *Bruen* analysis (they are not, as a historical inquiry must be conducted in every case), the Challenged Provisions still do not fall within that limited exception for a number of reasons. First, and most simply, the Challenged Provisions infringe upon the *purchase* (by members of "the people") and not the *sale* of arms (by Federal Firearms Licensees). Second, the Challenged Provisions are neither "conditions" (you must not be a felon) nor "qualifications" (you must be at least 18 years of age), but rather impose a default waiting period on the exercise of Second Amendment rights which would never be constitutionally permissible in the context of any other constitutional right. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002) (rejecting a requirement of obtaining a government permit before engaging in door-to-door advocacy protected by the First Amendment).

53. Indeed, the *Bruen* Court expressly warned of the inherent risk of delays created by government pre-approval or licensure of the exercise of the right to keep and bear arms, stating that "we do not rule out constitutional challenges to … regimes where, for example, lengthy wait times in processing license applications … deny ordinary citizens their right [to keep and bear arms]." *Bruen*, 142 S. Ct. at 2138 n.9. Indeed, it is well-established that the loss of a fundamental

right, for even minimal periods of time, unquestionably constitutes irreparable harm for purposes of injunctive relief.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

54.     The Challenged Provisions impose an *automatic* delay of indefinite duration on the right to keep and bear arms of *every* young adult under the age of 21.  As such, they infringe Second Amendment rights as explained in footnote 9 of *Bruen*.  *See also Robinson v. Sessions*, 721 F. App'x 20, 24 (2d Cir. 2018) (discussing for purposes of standing, delays in being able to purchase a firearm).

55.     Indeed, in *Heller* the Supreme Court identified *self-defense* as the central, foundational principle underlying the Second Amendment.  554 U.S. at 599.  The Challenged Provisions, however, inhibit (and thereby infringe) that right to self-defense for this limited age group, imposing a statutorily mandated waiting period on young adults.

56.     Yet, having just reached the age at which firearm ownership is lawful, those 18 to 20 years old are within a class of younger adults who are *the least likely to already possess a firearm*,[12] and thus in greatest need of being able to quickly obtain one with which to protect themselves.  Indeed, young adults represent the age groups most likely to be victims of serious and violent crime, and thus are most in need of the tools with which to defend themselves.[13]

57.     The Challenged Provisions invariably will result in young adults being delayed in acquiring protected arms, and thus being unable to defend themselves.  Such delays – even

---

[12] *See* https://www.statista.com/statistics/623409/gun-ownership-in-the-us-by-age/.
[13] *See* Craig A. Perkins, *Bureau of Justice Statistics Special Report: Age Patterns of Victims of Serious Violent Crime*, U.S. Dep't Just. (July 1997), https://bjs.ojp.gov/content/pub/pdf/apvsvc.pdf ("Persons age 18 to 21 were the most likely to experience a serious violent crime" at a rate "17 times higher than for persons age 65 or older," and "more than a fifth of all rape/sexual assault victims were age 18 to 21," which is "almost 22 times higher than those for age 25 to 29," and "persons 18 to 21 were most at risk of becoming a murder victim.").

temporary ones – have literally meant the difference between life and death.  *See* Perry

Chiaramonte, '*No One Helped Her': NJ Woman Murdered by Ex While Awaiting Gun Permit*, Fox

News (Jan. 12, 2017), https://www.foxnews.com/us/no-one-helped-her-nj-woman-murdered-by-

ex-while-awaiting-gun-permit; *see also* 137 Cong. Rec. Part 7 (Apr. 23, 1991 to May 8, 1991) at

10288,   https://www.govinfo.gov/content/pkg/GPO-CRECB-1991-pt7/pdf/GPO-CRECB-1991-

pt7.pdf ("women face these kinds of emergency self-protection situations frequently. Look at the

case of Bonnie Elmasri, of Wisconsin, whose husband repeatedly threatened to kill her. She

secured a restraining order. But because of the severity of her husband's threats, Bonnie didn't feel

this was enough. She tried to purchase a firearm for self-defense, but was told there was a 2-day

waiting period. The next day, Bonnie and her two sons, aged 17 and 3, were murdered by her

husband.").

58.      In addition, there is no relevantly similar historical tradition for such an

infringement as the Challenged Provisions impose, requiring a law-abiding adult member of "the

people" under the age of 21 to wait days or weeks in order merely to receive government

preclearance to acquire a firearm.  Indeed, there is no historical tradition during the Founding Era

requiring government preclearance at all, in order to keep or bear arms.  *See Antonyuk v. Hochul*,

2022 U.S. Dist. LEXIS 182965, at *27 (N.D.N.Y. Oct. 6, 2022) ("just as lacking, it appears, are

historical analogues requiring a responsible, law-abiding citizen to even apply to be able to carry

a gun."); *see also Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407,

439 (4th Cir.) ("At the time of ratification, there were no laws restricting minors' possession or

purchase of firearms."), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021); *NRA of Am., Inc. v.*

*Swearingen*, 545 F. Supp. 3d 1247, 1256 (N.D. Fla. 2021) (citation omitted) ("this Court has found

no case or article suggesting that, during the Founding Era, any law existed that imposed

restrictions on 18-to-20-year-olds' ability to purchase firearms. Given the amount of attention this issue has received, if such a law existed, someone surely would have identified it by now.").

59.     For these reasons, the Challenged Provisions should be enjoined and declared unconstitutional as violative of the Second Amendment.

### C.     Fifth Amendment Due Process.

60.     The *Bruen* decision made clear that the Second Amendment prescribes an "unqualified command," and the text and historical context of the Second Amendment supports the conclusion that "the people" to whom it applies includes adults aged 18 to 20 years.

61.     Yet the Challenged Provisions split into two distinct categories, and impermissibly treat differently, adults seeking to exercise their right to keep and bear arms. Adults aged 18 to 20 years, who have the same right to keep and bear arms as older adults, are categorically subjected to much greater scrutiny, and automatic categorical delay, in purchasing firearms than are those adults who are at least 21 years old. Under the Challenged Provisions, young adults are effectively second-class citizens when they attempt to exercise their right to purchase a firearm.

62.     Beginning with *Bolling v. Sharpe*, 347 U.S. 497 (1954), the Supreme Court has repeatedly held that, although the Fourteenth Amendment's "equal protection" clause applies only to the states, "discrimination may be so unjustifiable as to be violative of due process" under the Fifth Amendment, particularly when such discrimination is "*contrary to our traditions* and hence constitutionally suspect." *Id.* at 499 (emphasis added).

63.     In striking down a provision of the Social Security Act which afforded less protection for the survivors of female employees than was provided to male employees, the Supreme Court in *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975), again made clear that the Fifth Amendment provides the functional equivalent of "equal protection."  The Court stated that "the

challenged [classification] based on sex [was] premised on overbroad generalizations that could not be tolerated under the Constitution." *Id.* at 643 (quoting *Schlesinger v. Ballard*, 419 U.S. 498, 507 (1975)). Thus, the "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Id.* at 638 n.2; *see also Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *United States v. Paradise*, 480 U.S. 149, 166 n.16 (1987) (plurality opinion of Brennan, J.) ("[T]he reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth….").

64.     The Supreme Court reiterated this due process concept in *Lawrence v. Texas*, 539 U.S. 558 (2003), stating that "[e]quality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests." *Id.* at 575. The Court further held in *Lawrence* that "[competent adults'] right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. … As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Id.* at 578–79.

65.     Treating adults of different ages, all of whom constitute "the people," in a markedly different manner with regard to an enumerated constitutional right cannot possibly satisfy the due process guarantee of the Fifth Amendment. Even completely aside from *Bruen*, there cannot possibly be a constitutionally legitimate basis for automatically delaying an enumerated right to a 20-year-old when a 21-year-old has exactly the same probability of having a disqualifying juvenile or mental health record.

66.     Of course, *Bruen* should not be ignored here.  Indeed, the Court in *Bolling* looked at whether a law was "contrary to our traditions and hence constitutionally suspect," a test focusing on the historical tradition, akin to the methodology employed in *Bruen*.  Indeed, this nation's historical tradition is diametric to the Challenged Provisions, such that young adults between the ages of 18 and 20 represented the class of persons most likely to be *required by law* to be armed. *See Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing," such as by "those men who qualified for militia duty" – a group that invariably included those 18 to 20 years old).  Indeed, "[t]he average age of soldiers who served in the Continental Army was 18 to 20 years old, some as young as 14."[14]  Creating a special class of young adults who are singled out for disfavored treatment in obtaining arms is not only "contrary to our traditions," it is antithetical to this nation's traditions.

67.     The Challenged Provisions thus should be enjoined and declared unconstitutional as violative of the Fifth Amendment.

### D.     Plaintiff Ethan McRorey.

68.     Plaintiff Ethan McRorey is a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing or purchasing a firearm.  *See* Declaration of Ethan McRorey, Exhibit 6, ¶3.

69.     McRorey is a Corrections Officer with the Cooke County Sheriff's Office in Gainesville, Texas.  In this capacity, McRorey is responsible not only for the maintenance of inmates, but also with ensuring the security of the general public.  *Id.* ¶5.

---

[14]     *Washington     and     the     Revolutionary     War*,     Mount     Vernon, https://www.mountvernon.org/education/for-students/revolutionary-war     (quotation     under "Continental Army Muster Roll, 1779").

70.     McRorey has never been arrested or charged with any crime. *Id.* ¶3.  Quite to the contrary, McRorey's record is spotless – a requirement for his employment, where he has already passed a background check, and otherwise been thoroughly vetted, including through a rigorous mental health screening process.  *Id.* ¶6.

71.     But for the Challenged Provisions, there is no reason to suspect that McRorey would be delayed during a NICS background check.  However, as a direct result of the Challenged Provisions, McRorey will receive an automatic delay *every time* he attempts to purchase a shotgun or a rifle.

72.     McRorey has never purchased a firearm.  However, he wishes to acquire a shotgun to keep in his home for lawful purposes, including for self-defense. *Id.* ¶7.

73.     On May 12, 2023, Plaintiff McRorey attempted to purchase a 12 gauge shotgun from Academy Sports + Outdoors in Wichita Falls, Texas.  After choosing a firearm and filling out an ATF Form 4473, the staff submitted McRorey's information to the FBI's NICS system.  However, as required by the Challenged Provisions, McRorey was immediately delayed by NICS. *Id.* ¶¶8-10.

74.     Thus, Academy Sports advised McRorey that he had been automatically delayed, and was told that the store would contact him when the process was completed so he could pick up the firearm.  Due to the Challenged Provisions, McRorey was not able to complete his purchase of his firearm and take possession, but instead was forced to leave the store emptyhanded.  ¶10.

75.     Even if McRorey is successful in obtaining a firearm after enduring the unconstitutional delay in exercising his rights caused by the Challenged Provisions, this same harm will continue to befall not only McRorey in future firearm purchases (which McRorey intends to

make, *id.* ¶12), but also every 18-to-20-year-old in the nation who wishes to purchase a firearm from a FFL.

76.     Therefore, this case will not be mooted even upon a successful firearm purchase by McRorey, as the harm sought to be alleviated is "capable of repetition, yet evading review" because "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *See Ill. Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 187 (1979); *Sosna v. Iowa*, 419 U.S. 393 (1975).

77.     Furthermore, there are thousands of 18-to-20-year-old members and supporters of GOA and GOF, nationwide, who will continue to be subjected to the effects of the Challenged Provisions and suffer the irreparable harm caused by them, absent relief from the Court.

### E.     Plaintiff Kaylee Flores.

78.     Plaintiff Kaylee Flores is a law-abiding person, and has no disqualification under state or federal law which would prohibit her from possessing or purchasing a firearm.  *See* Declaration of Kaylee Flores, Exhibit 7, ¶3.

79.     Flores has never been arrested or charged with any crime. *Id.* ¶3.  But for the Challenged Provisions, there is no reason to suspect that Flores would be delayed during a NICS background check.  However, now that the Challenged Provisions are in place, Flores will receive an automatic delay every time she attempts to purchase a shotgun or a rifle.

80.     Ms. Flores does not own a firearm.  However, she wishes to acquire a shotgun to keep in her home for lawful purposes, including for self-defense.

81.     On May 12, 2023, Plaintiff Flores attempted to purchase a 20 gauge shotgun from WNC Guns in Abilene, Texas.  After choosing a firearm and filling out an ATF Form 4473, the

staff submitted Flores' information to the FBI's NICS system.  However, as required by the Challenged Provisions, Flores was immediately delayed by NICS.  *Id.* ¶¶6-7.

82.    Thus, WNC Guns advised Flores that she had been automatically delayed and advised that they would call her back when the process was completed.  Due to the Challenged Provisions, Flores was not able to complete her purchase of her firearm and take possession, but instead was forced to leave the store emptyhanded.  *Id.* ¶8.

83.    Even if Flores is successful in obtaining a firearm after enduring the unconstitutional delay in exercising her rights caused by the Challenged Provisions, this same harm will continue to befall not only Flores in future firearm purchases (which Flores intends to make, ¶10), but also every 18-to-20-year-old in the nation who wishes to purchase a firearm.

84.    This case will therefore not be mooted even upon a successful firearm purchase by Flores, as the harm sought to be alleviated is "capable of repetition, yet evading review" because "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *See Ill. Elections Bd.* 440 U.S. at 187; *Sosna*, 419 U.S. at 393.

85.    Furthermore, there are thousands of 18-to-20-year-old members and supporters of GOA and GOF, nationwide, who are being and will continue to be subjected to the effects of the Challenged Provisions, and who are suffering and will continue to suffer the irreparable harm caused by them, absent relief from this Court.

## COUNT I

## U.S. CONST., AMEND. II – DECLARATORY RELIEF AGAINST DEFENDANTS

86.    The foregoing allegations are repeated and realleged as if fully set forth herein.

87.    The Challenged Provisions infringe upon Plaintiffs' Second Amendment rights that "shall not be infringed."  These rights include the right to acquire a firearm for self-defense.

88.    Plaintiffs are or represent members of "the people" who desire to exercise their right to keep and bear arms by purchasing firearms from licensed dealers.  Yet the Challenged Provisions infringe that right, prohibiting Plaintiffs (including the members and supporters of GOA and GOF) from acquiring firearms, even to keep in their homes for self-defense.

89.    Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

90.    Thus, the burden is on the government to justify the Challenged Provisions based on the historical tradition of the activity that it is now attempting to regulate.

91.    There is no relevantly similar historical analogue to the Challenged Provisions (a mandated statutory period of delay before being permitted to acquire protected "arms") which would make them "consistent with this Nations' historical tradition of firearm regulation."

92.    By infringing the right to bear arms in these ways, the Challenged Provisions violate the Second Amendment, and they therefore are and should be declared invalid and unenforceable.

## COUNT II

## U.S. CONST., AMEND. V – DECLARATORY RELIEF AGAINST DEFENDANTS

93.    The foregoing allegations are repeated and realleged as if fully set forth herein.

94.     Adults aged 18–20 have the same right to keep and bear arms as older adults, are free to engage in the same range of conduct thereunder, and have the same right as older adults to exercise the right to keep and bear arms without additional government-imposed burden, delay, or intervention (*i.e.*, infringement), to include the purchase of firearms.

95.     Discriminating between 18-to-20-year-old adults and older adults with respect to the enumerated right to keep and bear arms is violative of the due process provided by the Fifth Amendment.

96.     By infringing the right to due process in this way, the Challenged Provisions as discussed in the foregoing allegations violate the Fifth Amendment, and they therefore are and should be declared invalid and unenforceable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that relief be granted, and judgment be entered in their favor and against Defendants as follows:

1.      An order temporarily restraining, and preliminarily and permanently enjoining, Defendants, including all subordinate officers, agents, servants, employees of the United States Department of Justice, and all persons in active concert or participation with them who receive actual notice of the injunction, from administering, enforcing, or otherwise requiring or seeking compliance by others with, the Challenged Provisions;

2.      An order declaring that the Challenged Provisions are invalid, unenforceable, unconstitutional, and violative of the Second and Fifth Amendments to the United States Constitution;

3.      An award of attorneys' fees and other litigation costs reasonably incurred in this action; and

4.     Such other further relief as is necessary to effectuate the Court's judgment or that the Court otherwise deems just and appropriate.

Respectfully submitted,

Dated:  May 12, 2023

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
E-mail: stephen@sdslaw.us

Brandon W. Barnett
Texas Bar No. 24053088
Barnett Howard & Williams PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
E-mail: barnett@bhwlawfirm.com

David G. Browne*
SPIRO & BROWNE, PLC
2400 Old Brick Road
Glen Allen, VA 23060
804-573-9220 (T)
804-836-1855 (F)
E-mail: dbrowne@sblawva.com
*Pro hac vice application forthcoming*

*Counsel for Plaintiffs*