**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

ETHAN MCROREY, KAYLEE FLORES, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION,

Plaintiffs,

v.

MERRICK B. GARLAND, in his Official Capacity as Attorney General of the United States, and the FEDERAL BUREAU OF INVESTIGATION,

Defendants.

Civil Action No. 7:23-cv-00047-O

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

I. Introduction.......................................................................................................1
II. Plaintiffs Have Standing............................................................................................ 1
III. Plaintiffs Are Entitled to a Temporary Restraining Order Followed by a Preliminary Injunction........................................................................................................ 4
 a. Plaintiffs Are Likely to Succeed on the Merits......................................................... 5
  i. The Challenged Provisions are repugnant to a plain reading of the Second Amendment, and contrary to the Supreme Court's clear teachings in *Bruen*....... 5
  ii. Under *Bruen*'s "historical tradition" standard of review, the Government cannot come close to justifying the Challenged Provisions.............................................7
 b. Plaintiffs Are Suffering and Will Continue Suffering Irreparable Harm Absent Preliminary Relief.........................................................................................12
 c. The Balance of Equities Tips Overwhelmingly in Plaintiffs' Favor.........................15
 d. An Injunction Is in the Public Interest.....................................................................16
IV. Conclusion.........................................................................................................17

**TABLE OF AUTHORITIES**

**Cases**

*Ass'n of Am. Phys. & Surg., Inc. v. Tex. Med. Bd.*, 627 F.3d 547 (5th Cir. 2010) ........................ 4

*Beeler v. Long*, No. 21-cv-152 (KAC/DCP), (E.D. Tn. Apr. 26, 2023) ........................................ 8

*Bezet v. United States*, 714 F. App'x 336 (5th Cir. 2017) ............................................................ 7

*Clark v. Prichard*, 812 F.2d 991 (5th Cir. 1987) .......................................................................... 4

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. Unit B Nov. 1981)........ 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................................... passim

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996)...................................................... 16

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................................... 5, 13

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ........................................ 6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................................... 5, 7

*Fed. Prescription Serv. v. Am. Pharm. Ass'n*, 636F.2d 755 (D.C. Cir. 1980)............................ 16

*Firearms Pol'y Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) ........................................................................................................ 7, 8

*Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432 (E.D. Va. May 10, 2023)........................ passim

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407 (4th Cir. 2021) 8, 10, 11

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411 n.3 (4th Cir. 1999)........................ 17

*Ill. Elections Bd. v. Socialist Workers Party*, 440 U.S. 173 (1979)............................................... 4

*In re Abbott*, 809 F. App'x 200 (5th Cir. 2020)............................................................................ 4

*Incubus Invs., L.L.C. v. City of Garland*, 2003 U.S. Dist. LEXIS 22752 (N.D. Tex. Dec. 17, 2003).................................................................................................................................... 17

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................................................ 1

*Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558 (6th Cir. 1982)....................................... 16

*Maryland Shall Issue, Inc. v. Moore*, No. 21-2017 (oral argument)............................................ 14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).................................................................... 10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)........................................ passim

*New York State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45 (2d Cir. 2018)................ 13

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................... 4

*NRA of Am. v. Bureau of Alcohol, Tobacco, Firearms and Explosives* 700 F.3d 185 (5th Cir. 2012)........................................................................................................................ 8

*NRA of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247 (N.D. Fla. 2021).................................. 10

*NRA v. BATFE*, 714 F.3d 334 (5th Cir. 2013) ............................................................................ 8

*NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) ............................................................... 8, 11, 12

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012)................................ 4

*Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502 (5th Cir. 2009).............. 12

*Parks v. Dunlop*, 517 F.2d 785 (5th Cir. 1975) .......................................................................... 12

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ................................................................................ 6

*Sosna v. Iowa*, 419 U.S. 393 (1975) ............................................................................................. 4

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ...................................................... 7

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021)..................................................... 4

*United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485 (W.D. Tex. Jan. 9, 2023) .......................... 7

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................ 4, 15, 16

*Worth v. Harrington*, 2023 U.S. Dist. LEXIS 56638 (D. Minn. Mar. 31, 2023)........................ 8, 9

**Statutes**

18 Pa. Cons. Stat. Ann. § 6111 ..................................................................................................... 14

18 U.S.C. § 922(t)(1)(C) ................................................................................................................. 1

34 U.S.C. § 40901(l) ........................................................................................................................ 1

Code of Virginia § 18.2-308.2:5 .................................................................................................... 14

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ................................................................................................................ 5

U.S. Const. amend. II ....................................................................................................................... 5

**Rules**

Fed. R. Civ. P. 65(c) ..................................................................................................................... 17

**I. Introduction.**

Plaintiffs in this action are challenging 18 U.S.C. § 922(t)(1)(C) and 34 U.S.C. § 40901(l) (the "Challenged Provisions"), which were enacted by Congress and signed by the President on June 25, 2022 as part of the so-called "Bipartisan Safer Communities Act," Pub. L. No. 117-159, 136 Stat. 1313. The Challenged Provisions took effect on November 14, 2022 and mandate an automatic, nationwide, indefinite waiting period on *every* prospective firearm purchaser who seeks to acquire a firearm at a federally licensed dealer and who is at least 18 years of age but under 21 years of age, delaying the exercise of and thereby infringing the right to keep and bear arms for this entire category of "the people." The Challenged Provisions also depend upon the federal government seeking and receiving responses from local law enforcement and countless state agencies throughout the nation, mandating that the federal NICS background check system contact such entities to request burdensome investigations into *every* prospective firearm transfer from a licensed dealer to an adult under the age of 21. Because the Challenged Provisions clearly violate Second Amendment rights, Plaintiffs request that this Court enter a temporary restraining order, followed by a preliminary and/or permanent injunction, to stop the irreparable harm Plaintiffs are suffering and will continue to suffer absent such relief, in the form of orders restraining and enjoining the administration, enforcement, and imposition of the requirements of the Challenged Provisions.

**II. Plaintiffs Have Standing.**

To show standing, an individual plaintiff must suffer a concrete and particularized invasion of a legally protected interest that is either actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This injury must be fairly traceable to the challenged action of the defendant(s) and likely to be redressed by a favorable decision. *Id.* at 560–61. In this case, the two individual

Plaintiffs have already been subjected to actual injury by way of infringement of their constitutional rights, having attempted to purchase firearms and having been subjected to the automatic delay in exercising their rights created by the Challenged Provisions. Additionally, both the named Plaintiffs and all other adults under the age of 21 who wish to purchase firearms from federally licensed dealers are subject to automatic, ongoing future infringement on their Second Amendment rights by operation of the Challenged Provisions. Due to the incontrovertible constitutional violations at issue here, Plaintiffs easily satisfy requirements of standing, as they have suffered both actual harm and will continue to suffer the same harm anytime they seek to purchase a firearm in the future.

Plaintiff Ethan McRorey ("McRorey") is 20 years old and is a law-abiding person who is eligible to possess firearms in the State of Texas and eligible to purchase shotguns and rifles under federal law. He works as a corrections officer and has a spotless criminal record, having never been arrested or charged with any crime and having undergone a thorough background and mental health assessment in connection with his employment. *See* Complaint Ex. "6." On May 12, 2023, McRorey attempted to purchase a shotgun in Wichita Falls, Texas. After choosing a firearm and filling out an ATF Form 4473, the staff submitted McRorey's information to the FBI's NICS system. However, as required by the Challenged Provisions, McRorey was immediately delayed by NICS. Thus, Academy Sports advised McRorey that he had been automatically delayed and that the store would contact him when the process was completed so he could pick up his firearm. Due to the Challenged Provisions, McRorey was not able to complete his purchase of his firearm and take possession, but instead was forced to leave the store emptyhanded. Even if McRorey is successful in obtaining *this* firearm after enduring the unconstitutional delay in exercising his rights caused by the Challenged Provisions, this same harm will continue to befall not only

McRorey in future firearm purchases (which McRorey intends to make), but also every 18-to-20-year-old in the nation who wishes to purchase a firearm from a federally licensed dealer.

Plaintiff Kaylee Flores ("Flores") is 19 years old and is a law-abiding person who is eligible to possess firearms in the State of Texas and eligible to purchase shotguns and rifles under federal law, and has never been charged with or convicted of any crime. *See* Complaint Ex. "7." On May 12, 2023, Flores attempted to purchase a shotgun in Abilene, Texas. After choosing a firearm and filling out an ATF Form 4473, the staff submitted Flores' information to the FBI's NICS system. However, as required by the Challenged Provisions, Flores was immediately delayed by NICS. Thus, WNC Guns advised Flores that she had been automatically delayed, and that they would contact her when the process was completed. Due to the Challenged Provisions, Flores was not able to complete her purchase of her firearm and take possession, but instead was forced to leave the store emptyhanded. Even if Flores is successful in obtaining *this* firearm after enduring the unconstitutional delay in exercising her rights caused by the Challenged Provisions, this same harm will continue to befall not only Flores in future firearm purchases (which Flores intends to make), but also every 18-to-20-year-old in the nation who wishes to purchase a firearm from a federally licensed dealer.

Each of these two Plaintiffs has established their respective standing by declaring the harm that they have suffered already and their future intentions, as set forth in the Complaint and their accompanying Declarations. Likewise, Gun Owners of America ("GOA") and Gun Owners Foundation ("GOF") have numerous members and supporters under the age of 21 who are affected by the Challenged Provisions;[1] thus, GOA and GOF also have standing because (a) each of their relevant members would have standing to sue individually; (b) the interests they seek to protect

[1] *See* Complaint Ex. "1."

are germane to their purposes; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Ass'n of Am. Phys. & Surg., Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

Furthermore, this case and the need for the relief sought by this Motion will not be mooted even upon a successful firearm purchase by the individual Plaintiffs, as the harm sought to be alleviated is "capable of repetition, yet evading review" because "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *See Ill. Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 187 (1979); *Sosna v. Iowa*, 419 U.S. 393 (1975).

**III. Plaintiffs Are Entitled to a Temporary Restraining Order Followed by a Preliminary Injunction.**

The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction. *Texas v. United States*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)); *see also In re Abbott*, 809 F. App'x 200, 201 (5th Cir. 2020). The standard for a preliminary injunction requires Plaintiffs to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary

Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)). Furthermore, "[t]he loss of [constitutionally enumerated] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Plaintiffs are unquestionably able to demonstrate a substantial likelihood of success given that the Challenged Provisions categorically and automatically deprive them of their right to keep and bear arms for a *substantial* period of time. Plaintiffs also easily demonstrate that the balance of equities tips in their favor and that injunctive relief undoubtedly would be in the public interest.

**A. Plaintiffs Are Likely to Succeed on the Merits.**

i. The Challenged Provisions are repugnant to a plain reading of the Second Amendment, and contrary to the Supreme Court's clear teachings in *Bruen*.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Furthermore, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). The Supreme Court has recently explained that:

> [t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (citation omitted).]

Under the *Bruen* test, it does not matter whether a government restriction "minimally" or "severely" burdens (infringes) the Second Amendment, nor – as in this case – does it matter how long the infringement lasts (as even a brief deprivation of an enumerated right causes irreparable harm). There are no relevant statistical studies to be consulted. There are no sociological

arguments to be considered. The ubiquitous problems of crime, or the allegedly heightened dangers of younger adults possessing firearms, do not affect the equation. Nor should the Court afford any deference because the Challenged Provisions were enacted by Congress. While "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 2131 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The only appropriate inquiry, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868. *Id.* at 2137–38.[2]

The Challenged Provisions, and their requirement for an automatic delay for the purchase of a firearm, fail under the simple standard articulated most recently in *Bruen*, because there is no historical analogue for automatically imposing a delay (here, of *at least* several days) when a

[2] With respect to whether post-founding historical sources have any role *at all* to play in the analysis, the Supreme Court technically left the question open, finding it unnecessary to its decision in *Bruen*. 142 S. Ct. at 2138. Nevertheless, as the Court has repeatedly made clear, even prior to *Bruen*, that Reconstruction-era historical sources are to be used (at most) only *as confirmation* of a historical tradition that was already in existence during the founding. For example, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), the Court rejected the fact that "more than 30 States" had enacted a certain type of legislation in the mid-to-late 19th century, explaining that even such a pattern "cannot by itself establish an early American tradition." *Id.* at 2258-59; *see also Bruen*, 142 S. Ct. at 2137 (using 1800s sources only "as mere confirmation of what the Court thought already had been established"); *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (20
20); *Fraser* at *15 ("The further the evidence is removed from 1791, in either direction, the less salient the evidence becomes.")

person seeks to acquire a firearm, to allow the government to engage in a scavenger hunt at multiple state and local agencies, entities that may or may not even be willing to participate.

ii. Under *Bruen*'s "historical tradition" standard of review, the Government cannot come close to justifying the Challenged Provisions.

Under *Heller* and *Bruen*, the standard for assessing Second Amendment challenges first requires Plaintiffs to show that their conduct falls under the Second Amendment's plain text. *Bruen*, 142 S. Ct. at 2126. The right to acquire a firearm squarely within the protections of the Second Amendment, as the right to "keep and bear" arms would be meaningless if one could not even obtain arms. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use...."); *Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017) (emphasis added) (referencing "*the core Second Amendment guarantee of acquiring firearms* to protect one's hearth and home."); *United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5 (W.D. Tex. Jan. 9, 2023) ("The clear answer is that 'keep and bear arms' includes receipt"); *Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432 (E.D. Va. May 10, 2023) at *9 *and also* at *17- ("the Second Amendment protects the right to *purchase*, not just to *possess*, a firearm.").

It also should be beyond debate that adults aged 18–20 are part of "the People" as contemplated by the Second Amendment, and have the same right to keep and bear arms as "older" adults. *See Firearms Pol'y Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) (analyzing and answering in the affirmative the question of whether 18-to-20-year-olds are part of "the People" under the Second Amendment, for purposes of determining whether they have a right to carry a handgun for self-defense in public); *see also*

*Worth v. Harrington*, No. 21-cv-1348 (KMM/LIB), 2023 U.S. Dist. LEXIS 56638, at *21–22 (D. Minn. Mar. 31, 2023) ("the text of the Second Amendment includes within the right to keep and bear arms 18-to-20-year-olds, and therefore, the Second Amendment 'presumptively guarantees [Plaintiffs'] right to "bear" arms in public for self-defense.'"); *Beeler v. Long*, No. 21-cv-152 (KAC/DCP), ECF #50 (E.D. Tn. Apr. 26, 2023).

In fact, it is plainly evident that young adults had the same rights to keep and bear arms as their elder counterparts during the Ratification Era. As Plaintiffs' Complaint describes, the 1792 Second Militia Act provided that males aged 18-45 were part of the militia. *See* Compl. ¶44. And "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen." *NRA v. BATFE*, 714 F.3d 334, 340 (5th Cir. 2013) (Jones, J., dissenting from denial of reh'g. *en banc*); *see also Hirschfeld* at 428 ("[e]very militia law near the time of ratification required 18-year-olds to be part of the militia and bring their own arms"); *but see NRA v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023) (opining that "[t]he fact that federal law obliged 18-to-20-year olds to join the militia does not mean that 18-to-20-year-olds had an absolute right to buy arms."); *Fraser* at *38-48 (providing an analysis of early militia laws as generally including those 16 or 18 years of age, and noting that the Second Militia Act required such persons to "provide himself with a good musket…."). *But see NRA of Am. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 202 (5th Cir. 2012) (suggesting, but not deciding, that 18-20 year olds are not protected under the Second Amendment because "[t]he age of majority at common law was 21"); *cf. McCraw* at *9-15 (finding that 18-20 year olds are clearly protected by the Second Amendment); *Fraser* at *22-33 (same) and at 33-37 (separately finding that those 18-20 are "members of the political community … under today's standards");

*Worth* at *21-22 (same); *Bruen* at 2134 ("the Second Amendment protects … ordinary, law-abiding, adult citizens").

Thus, as Plaintiffs have shown that the conduct regulated by the Challenged Provisions falls under the Second Amendment's plain text, the government must rebut the strong resulting presumption of Second Amendment protection:

> [T]he government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*Bruen*, 142 S. Ct. at 2126.]

The government thus bears the burden of justifying the regulation by "affirmatively prov[ing] that [the] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The government cannot possibly do so in this case, as no historical analogue to the Challenged Provisions exists that is even *remotely* similar.

The Second Amendment analysis "requires courts to assess whether modern firearms regulations are consistent with" the Second Amendment's "text and historical understanding," *id.* at 2131, meaning courts must examine the *original public understanding* of the right when it was adopted. *See id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35) ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'"). Courts must consider whether the challenged regulation finds constitutional support from directly related or sufficiently analogous historical regulations from the Founding Era, which evidence acceptance of a certain type of regulation as not infringing on the preexisting right to keep and bear arms (and thus being entirely outside the scope of the Second Amendment's protection). This necessarily requires courts to compare "how and why" certain Founding Era restrictions regulated certain persons,

arms, or activities. *Id.* at 2133. According to *Bruen*, these are "'*central*' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

The government cannot possibly meet this burden, and undoubtedly will harp on the "why" portion of the "how and why" analysis, citing its policy goals of preventing persons allegedly prohibited from possessing firearms from acquiring them (such as the mentally ill). But the Challenged Provisions go *well* beyond merely "prohibiting possession" by these categories of persons, by automatically, preemptively, and indiscriminately infringing on the rights of *every* single 18-to-20-year-old involved in *every* retail purchase of every firearm, the overwhelming majority of whom are *not* prohibited under any purportedly "longstanding prohibitions" on possession of firearms by felons and the mentally ill. The government cannot even approach satisfaction of the historical "how" portion of the analysis under *Bruen*, because the notion that every 18-to-20-year-old in the Founding Era would have to automatically wait for days or weeks to simply acquire a firearm, while the government contacted numerous holders of records, would have been as baffling and abhorrent to Americans of that time as it is now.

More than one court to have considered the issue have been unable to locate *any* relevant analogue from the Founding Era that restricted 18-to-20-year-olds from purchasing firearms. *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 439 (4th Cir. 2021) ("At the time of ratification, there were no laws restricting minors' possession or purchase of firearms."), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021); *NRA of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1256 (N.D. Fla. 2021) (citation omitted) ("this Court has found no case or article suggesting that, during the Founding Era, any law existed that imposed restrictions on 18-to-20-year-olds' ability to purchase firearms... Given the amount of attention this issue has

received, if such a law existed, someone surely would have identified it by now."); *Fraser* at *47 ("The Government has not presented any evidence of age-based restrictions on the purchase or sale of firearms from the colonial era, Founding, or Early Republic.").

Defendants expectedly will rely on a recent Eleventh Circuit panel decision in *NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) (petition for rehearing *en banc* pending), which found a Florida statute altogether prohibiting the purchase of firearms by 18-to-20-year-olds to be constitutional subsequent to *Bruen*. Plaintiffs submit that the *Bondi* panel's opinion is unpersuasive and frankly facially erroneous, as it blatantly disregarded certain of *Bruen*'s key teachings. At bottom, the Eleventh Circuit placed undue emphasis on Reconstruction Era analogues (citing, in fact, even much later statutes up until 1900, *id.* at 1333), wrongly claiming that such "sources [we]re the most relevant to [its] inquiry on the scope of the right to keep and bear arms." *Id.* at 1321. But as noted, *supra* at n.1, Reconstruction Era sources may well *confirm* a historical tradition, but they *cannot create* one. Indeed, but "to the extent later history contradicts what the text says, the text controls." *Bruen* at 2137 ("postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.").[3]

[3] *Even if* such late coming statutes had any value at all, the Eleventh Circuit identified only a small minority of 7 states (out of 38 at the time, or 18 percent) that, by 1880, had limited minors' access to firearms in any way. *Id*. at 1333. Moreover, five of these seven statutes applied only to the sale of "pistols," which are not the rifles or shotguns at issue in this case. In other words, only two of 38 states (Kentucky and Missouri) appear to have banned sales of long guns to minors even as late as 1880. On the other end of the spectrum, an "1868 Oregon law affirmatively protect[ed] the gun rights of those older than 16." *Hirschfeld* at 439. This is far from a broad and enduring tradition. *See Bruen* at 2156 (flatly rejecting "a few late-19th-century outlier jurisdictions…."); *see Hirschfeld* at 440 (discussing whether these Reconstruction Era state statutes had their roots in racist attempts to disarm freed slaves).

The *Bondi* Court justified its sole reliance on Reconstruction Era analogues on the theory that "the Reconstruction Era [was] when the people adopted the Fourteenth Amendment." *Id*. at 1320. But this directly contravenes *Bruen*'s explicit instruction that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope as against the Federal Government*," and it is "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137 (emphasis added).

*Bondi*'s overemphasis (indeed, sole emphasis) on Reconstruction sources in a Second and Fourteenth Amendment challenge to a state law creates an untenable condition where the Second Amendment means something less against the states than it does against the federal government. No other constitutional right suffers from such a narrowing of scope depending on the government responsible for the infringing. But, of course, the Eleventh Circuit's faulty logic has no application here for an independent reason, because *Plaintiffs challenge federal laws*, and thus for that independent reason, Reconstruction sources have greatly diminished – if not entirely irrelevant – utility. *See Fraser* at *37 n.21 and 51 n.44.

**B. Plaintiffs Are Suffering and Will Continue Suffering Irreparable Harm Absent Preliminary Relief.**

In general, harm is irreparable where there is no adequate remedy at law, such as monetary damages. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). The loss of an enumerated constitutional right for even "minimal periods" of time constitutes irreparable harm for purposes of injunctive relief. *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (quoting *Deerfield Med. Ctr.*, 661 F.2d at 338); *see also Elrod v. Burns*, 427 U.S. 347,

373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The Challenged Provisions declare the entire adult population over 18 and under the age of 21, including Plaintiffs, to be presumptively unfit to exercise their enumerated right to keep and bear arms, and automatically deprive these parties of their constitutional rights for *more* than a "minimal" period of time. Rather than merely prohibiting possession of firearms by felons and the mentally ill, the Challenged Provisions stand the right to keep and bear arms on its head, forcing every member of this population to wait while the government determines they *are not* prohibited.[4]

---

[4] To the extent that the government might claim that Plaintiffs are suffering no harm because they still might, theoretically, locate and obtain a firearm through gift, or via a *private sale*, the Supreme Court already has repudiated a virtually identical argument, explaining that "[i]t is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; *see also Fraser* at *9-10 (criticizing the notion that purchasing a used potentially unsafe firearm, with no warranty, in a private sale at a gun show is somehow a constitutional substitute). Indeed, purchasing firearms from a federally licensed dealer is the manner of acquisition chosen by the overwhelming majority of Americans. Indeed, the FBI reports having conducted anywhere between 30 and 40 million background checks for licensed dealers annually for the past several years. https://www.fbi.gov/file-repository/nics_firearm_checks_-_day_month_year.pdf.

Any such argument by the government also would be reminiscent of the "ample alternative means" doctrine, a First Amendment balancing test that has no place in Second Amendment law, especially after *Bruen*'s explicit rejection (for the third time) of any sort of "judge-empowering 'interest-balancing inquiry.'" *Id.* at 2129. *See New York State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 60 (2d Cir. 2018) (applying the now-repudiated two-step balancing test, and asking whether a law "substantially burdens Second Amendment rights [based on] whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms….").

Finally, such an argument would ignore the practical realities inherent to private sales of firearms, including (1) the difficulty of finding the right gun at the right price, (2) verifying condition and functionality of a used product with no warranty, (3) the risks of meeting a stranger in a strange place, (4) coordinating a convenient time and place, (5) finding a seller willing to sell a firearm to a young person between the ages 18 and 21 and (6) the fact that many states require

Indeed, the individual Plaintiffs in this case already have suffered this irreparable harm, are currently suffering harm, and will continue to suffer harm, absent relief from this Court.

As Fourth Circuit Judge Richardson stated during March 2023 oral arguments in *Maryland Shall Issue, Inc. v. Moore*, No. 21-2017, while questioning counsel for the State of Maryland:

> Imagine you've got a community, and you think a crime is about to occur, and you go to that community, and you round up everybody in the community, and you put them in prison for thirty days, or thirteen days, right, and you say somebody here is bad. Most of you, y'all are great, you're law-abiding citizens. But somebody here is bad, and you might be planning on doing something bad. Wouldn't we say that is an infringement of their Fourth Amendment rights? So, the law-abiding citizen, just 'cause it's thirteen days or thirty days, doesn't mean that it's ... de minimis, right, and so you're only in the pokey for thirty days.... We would say that is an infringement of the Fourth Amendment, right, even if it was designed to protect the public ....[5]

Of course, Judge Richardson's hypothetical was designed to draw the obvious inference to the Second Amendment context, with respect to Maryland's requirement that a person obtain a license and engage in training (both of which cause significant delays) before being permitted *even to acquire* a handgun. Likewise, the Challenged Provisions here create inherent delays *to acquiring* a rifle or shotgun, treating all 18-to-20-year-olds as a suspect class, infringing the constitutional rights of all in a purported effort to target those with alleged previous mental health issues. The Challenged Provisions create the same sort of delays to the exercise of an enumerated right that

---

even private sales to be conducted through a federally licensed dealer. *See, e.g.*, Code of Virginia § 18.2-308.2:5; 18 Pa. Cons. Stat. Ann. § 6111 *et seq*; *see also Fraser* at *8 (flatly rejecting the "argument … that requiring an adult, law-abiding citizen to exercise the claimed right through, and at the grace of, a third party is not an infringement of the alleged right").

At bottom, the federal government does not get to pick and choose how Americans exercise their constitutional rights. Rather, "[t]he very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller* at 634.

[5] https://www.ca4.uscourts.gov/OAarchive/mp3/21-2017-20230310.mp3, at 29:00.

Judge Richardson criticized, they effect the same sort of irreparable harm to Plaintiffs, and they are equally unconstitutional.

**C. The Balance of Equities Tips Overwhelmingly in Plaintiffs' Favor.**

In assessing this injunction factor, courts "must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24. The harm to Plaintiffs and to all 18-to-20-year-olds is actual and ongoing, in the form of a direct infringement on an enumerated constitutional right. The harm to the government is entirely speculative and theoretical, in the form of a miniscule proportion of possible firearms purchasers aged 18–20 who *might* be prohibited from possessing a firearm for mental health reasons – and will *remain* prohibited from such possession even if the Challenged Provisions are enjoined. This small class of persons is further limited such that it includes only those for whom the NICS system does not *already* possess the relevant disqualifying records, on the chance that some errant state record will be uncovered and found to be disqualifying. From that miniscule group of persons, the government must then hypothesize that someone might acquire a shotgun or rifle (the only firearms that young adults may lawfully purchase from an FFL), and thereafter use it for an evil purpose, in spite of the fact that handguns are almost always the choice of weapon for criminals. Of course, this also assumes that such a person could not acquire the same firearm elsewhere, such as in a private sale, as a loan or gift from a friend or family, or through criminal means (such as theft). Needless to say, any possible harm to the government from enjoining the Challenged Provisions requires speculation layered on speculation, and pales in comparison to the real-world irreparable harms to constitutional rights (and potentially risk to life and limb) caused by denying countless law-abiding and American adults (including

Plaintiffs) ready access to protected "arms." Thus, the balance of equities is strongly in Plaintiffs' favor.

**D. An Injunction Is in the Public Interest.**

"[T]he public consequences in employing the extraordinary remedy of injunction" are not just the vindication of constitutional rights but also the prevention of their egregious curtailment. *Winter*, 555 U.S. at 24. Preventing the government from violating constitutional rights is always in the public interest. Here, such egregious curtailment of the right to keep and bear arms is exactly what the Supreme Court warned would be unconstitutional in *Bruen*. Furthermore, although public interest is a necessary prong for injunctive relief, under *Bruen*, the government can no longer rely on the typical "public safety" talisman as an automatic justification for public interest. As Justice Thomas explained, "the Second Amendment does not permit—let alone require—'judges to assess the costs and benefits of firearms restrictions' under means-end scrutiny." *Bruen*, 142 S. Ct. at 2129.

Because Plaintiffs are part of "the people" and the Challenged Provisions infringe upon their right to keep and bear arms, the government carries the burden of justifying, via historical analogue, how the Challenged Provisions are constitutionally permissible. It cannot possibly shoulder this burden, because these provisions consist of unprecedented and automatic deprivations of constitutional rights that have no historical analogue. Without historical support, the public interest requirement clearly weighs in favor of the Plaintiffs, as it is *always* in the public interest to enjoin an unconstitutional law. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).[6]

---

[6] Although Fed. R. Civ. P. 65(c) requires that a bond or other security be provided as a condition of issuing preliminary injunctions, this requirement may be dispensed with when there is no risk of financial harm. *Fed. Prescription Serv. v. Am. Pharm. Ass'n*, 636F.2d 755, 759 (D.C. Cir. 1980);

**IV. Conclusion.**

For the foregoing reasons, the Court should issue a temporary restraining order, followed by a preliminary and/or permanent injunction, to stop the irreparable harm Plaintiffs are suffering and will continue to suffer absent such relief, in the form of orders restraining and enjoining the administration, enforcement, and imposition of the requirements of the Challenged Provisions. As GOA and GOF have affected members and supporters in numerous states across the country, Plaintiffs submit that relief should apply nationwide, in other to grant Plaintiffs the full relief to which their members and supporters are entitled.

Respectfully submitted, this the 12th day of May, 2023

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
E-mail: stephen@sdslaw.us

Brandon W. Barnett
Texas Bar No. 24053088
Barnett Howard & Williams PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
E-mail: barnett@bhwlawfirm.com

---

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).Even courts that view Rule 65(c) as mandatory are open to the idea of the bond being set at zero. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 n.3 (4th Cir. 1999). Given the nature of this case, the Court should dispense with the bond requirement. *See Incubus Invs., L.L.C. v. City of Garland*, No. 3:03-CV-2039-K, 2003 U.S. Dist. LEXIS 22752, at *13–14 (N.D. Tex. Dec. 17, 2003) (dispensing with bond because "to require a bond would have a negative impact on Plaintiff's constitutional rights, as well as the constitutional rights of the members of the public"). This Court should dispense with that requirement here.

David G. Browne*
Spiro & Browne, PLC
2400 Old Brick Road
Glen Allen, VA 23060
804-573-9220 (T)
804-836-1855 (F)
E-mail: dbrowne@sblawva.com
**Pro hac vice application forthcoming*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be mailed by United States Postal Service first-class mail, postage pre-paid, to the following non-ECF participants:

Federal Bureau of Investigation
J. Edgar Hoover Building
925 Pennsylvania Ave, NW
Washington, DC 20535

United States Attorney General
Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

US Attorney for the Northern District of Texas
ATTN: Civil Process Clerk
1100 Commerce Street, Third Floor
Dallas, TX 75242

And by electronic mail to:

Daniel Riess, Esq.
Abby Wright, Esq.
Mark Stern, Esq.
Bradley Hinshelwood, Esq.
Trial Attorney
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, D.C. 200005
Phone: 202-353-3098
Fax: 202-616-8460
Email: Daniel.Riess@usdoj.gov
abby.wright@usdoj.gov
mark.stern@usdoj.gov
bradley.a.hinshelwood@usdoj.gov

Dated: May 12, 2023.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh