**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| ETHAN MCROREY, KAYLEE FLORES, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 7:23-cv-00047-O |
| MERRICK B. GARLAND, in his Official Capacity as Attorney General of the United States, and the FEDERAL BUREAU OF INVESTIGATION, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR PERMANENT INJUNCTION**

# TABLE OF CONTENTS

I.     Defendants' Argument that "Plaintiffs' Claims Are Moot or Will Soon Become Moot" Is Meritless..................................................................................................................1

II.    Defendants Fail to Undermine Plaintiffs' Likelihood of Success on the Merits............2

       A.  *Heller*'s "Commercial Sale of Arms" Language Is Not a Magic Talisman.............2

       B.  The Historical Record Supports Plaintiffs and Not the Government......................5

III.   Defendants Fail to Undermine Plaintiffs' Clear Showing of Irreparable Harm.............9

IV.    Defendants Offer Nothing to Shift the Balance of Equities in Their Favor................10

V.     The Appropriate Scope of Relief.................................................................................12

VI.    In Responding to Plaintiffs' Motion, Defendants Relied on Information that Federal Law Required the Government to Have Previously Destroyed...................................13

Conclusion................................................................................................................................15

i

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk, et al. v. Hochul, et al.,* No. 1:22-cv-00986 (N.D.N.Y.), ECF 73, Hearing Transcript... 4

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................................. 2, 7, 8

*Firearms Policy Coal., Inc. v. McCraw*, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) ........................................................................................................................... 7

*Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432 (E.D. Va. May 10, 2023)......................... 3, 4, 7

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ............................................................................ 6

*Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015) ............................................................ 8

*Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613 (N.D. Ill. June 9, 2021) ........................... 12

*Maryland v. Wilson*, 519 U.S. 408 (1997) ................................................................................. 4

*McDonald v. City of Chicago*, 561 U.S. 742  (2010)................................................................... 2

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)........................................ passim

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ..................................................... 12

*NRA v. ATF*, 700 F.3d 185 (5th Cir. 2012) ......................................................................... 5, 6, 8

*Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375  (D. Del. Sept. 23, 2022).............................. 2

*Save Our Cmty. v. United States EPA*, 971 F.2d 1155 (5th Cir. 1992) ...................................... 2

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996) ......... 12

*United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485 (W.D. Tex. Jan. 9, 2023) ..................... 2, 3

*West Virginia v. United States EPA*, 2023 U.S. Dist. LEXIS 64372 (D. N.D. Apr. 12, 2023) .... 13

**Statutes**

18 U.S.C. Section 922(t)(2) ....................................................................................................... 13

18 U.S.C. Section 926(a)(3)....................................................................................................... 15

**Rules**

Fed. R. Civ. P. 65 ...................................................................................................................... 12

**Treatises**

1 William Blackstone, Commentaries ......................................................................................... 6

**Regulations**

28 CFR § 25.9(b) ................................................................................................................. 14, 15

I.    **Defendants' Argument that "Plaintiffs' Claims Are Moot or Will Soon Become Moot" Is Meritless.**

Defendants argue that "McRorey's Second Amendment claim … is now moot," on the theory that his background check was eventually "approved" after a multi-day delay required by the Challenged Provisions, meaning his FFL was permitted to transfer the firearm.  Resp. at 10. Indeed, McRorey was able to acquire his firearm on May 22, 2023, ten days after his attempted purchase.  *See* Supplemental Declaration of Ethan McRorey, Exhibit A at ¶4.  Similarly, Defendants claim that Flores's "claim *will be* moot no later than 12:01 a.m. on May 27, 2023" – *fifteen days* after she attempted to purchase a firearm – at which point her FFL has the *option* (but not the *obligation*) to complete the transfer.  Resp. at 10 (emphasis added).  As of the date of this filing, Flores's is still waiting for her background check to be approved so that she can acquire her first firearm.  Supplemental Declaration of Kaylee Flores, Exhibit B at ¶5.

Defendants claim that, as of May 27, any further harm (*e.g.*, Flores's FFL refusing to transfer her firearm until receiving an affirmative approval) is traceable to the FFL, not Defendants. *Id.* at 24 n.13.  Moreover, Defendants claim that this matter is not "capable of repetition yet evading review," arguing that McRorey and Flores have not been specific enough as to when they intend to purchase additional firearms.  *Id.* at 11.  But this Court need not answer either of these questions, because not only does McRorey "fully intend" to acquire additional firearms, in fact *he has done so*, having attempted to obtain a second firearm today, May 26, 2023, and having been delayed indefinitely for a second time.  Exhibit A at ¶¶5-8.

Moreover, after asserting that "the Court lacks subject-matter jurisdiction over Plaintiffs' claims *as to Mr. McRorey* and … soon … *as to Ms. Flores*" (Resp. at 11), Defendants leap to the untenable conclusion that "the Court lacks subject-matter jurisdiction" generally because *Plaintiffs' claims are moot*" entirely.  Resp. at 10 (emphasis added).  Defendants appear to believe

1

that the ripeness of McRorey and Flores's claims is all that is at issue, overlooking the representational standing of Plaintiffs GOA and GOF who are litigating on behalf of numerous similarly situated members and supporters who have suffered, are suffering, and will continue to suffer the same harm as the individual Plaintiffs.  ECF # 1-1 at 3; *see Save Our Cmty. v. United States EPA*, 971 F.2d 1155, 1160 (5th Cir. 1992).  Either way, Plaintiffs' claims are not moot.

## II.    Defendants Fail to Undermine Plaintiffs' Likelihood of Success on the Merits.

### A. *Heller*'s "Commercial Sale of Arms" Language Is Not a Magic Talisman

Defendants first argue that Plaintiffs' Second Amendment claim cannot succeed because an "enhanced background check" for young adults is merely a "regulation[] governing the commercial sale of arms," which Defendants contend *District of Columbia v. Heller*, 554 U.S. 570 (2008) found to be definitively constitutional.  Resp. at 12.  On the contrary, none of the Supreme Court's decisions (*Heller, McDonald v. City of Chicago*, 561 U.S. 742  (2010)*, or *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)) determined the constitutionality of any matter not before the Court, but rather merely warned readers not to infer too broadly from those holdings. Certainly, the Supreme Court has never indicated that any sort of firearm restriction is immune from historical analysis under *Bruen*.  Indeed, "not every regulation on the commercial sale of arms is presumptively lawful," and *all* must be subject to the *Bruen* framework.  *Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375, at *14 (D. Del. Sept. 23, 2022); *see also United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *6 (W.D. Tex. Jan. 9, 2023) ("The clear answer is that 'keep and bear arms' includes receipt. Thus, the Government must justify [the law] through a historical analysis….").

Moreover, at least one district court has concluded specifically that *Heller*'s "commercial *sale* of arms" (*e.g.*, dealer licensing, inventory controls, etc.) language has no application to the

*purchases* at issue here. *Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432, at *56 (E.D. Va. May 10, 2023) ("differentiating restrictions on buyers from restrictions on sellers"). By the government's logic, Congress could impose a point-of-sale poll tax or literacy test for gun sales, characterize them as "regulations governing the commercial sale of arms," and claim them to be definitively constitutional without any further analysis. *But see Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5-6 ("according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!").

Next, Defendants blatantly attempt to return to a pre-*Bruen* interest balancing scheme, arguing that "only … a days-long delay" is not an "extraordinarily 'severe[]' restriction" on Second Amendment rights, and that "less extensive restrictions" do not affect "'the core Second Amendment guarantee of acquiring firearms….'" Resp. at 13. Rather, Defendants argue that *only* a "regulation so severe that it effectively inhibits" gun possession would be impermissible. *Id.* at 14. Of course, *Bruen* rejected precisely this sort of analysis – in so many words. *Bruen*, 142 at 2126 (denouncing step two of the "two-step approach," which examines "'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right'").[1]

Third, Defendants assert that *Bruen* itself forecloses Plaintiffs' Second Amendment claim, claiming that the Court "approved 'shall-issue' regimes" for licensing the carrying of firearms. Resp. at 14, 23 ("shall-issue regimes that the Supreme Court stated in *Bruen* are facially

---

[1] Defendants' attempt to distinguish Judge Richardson's statement at oral argument in *MSI v. Moore*, which Defendants posit "concerns a more restrictive regulation" than here, fails for the same reason – all severities of infringement are subject to the same analysis under *Bruen*. *See* Resp. at 14 n.4.

3

constitutional," and claiming the Court made an "express statement that these regimes are constitutional unless applied to abusive ends…."). There is no such express statement in *Bruen*. Rather, Defendants commit a logical fallacy (assuming that the lack of a negative holding equates to a positive holding), a position that another district court judge has called "just disingenuous." *Antonyuk, et al. v. Hochul*, *et al.,* No. 1:22-cv-00986 (N.D.N.Y.), ECF 73, Hearing Transcript at 60 ll.10-15.[2]  Indeed, *Bruen*'s caution that the Court's ruling did not address different types of statutes from other states, which were not before the Court, does not mean the Court somehow affirmed the *constitutionality* of those other statutory schemes. Defendants claim to find further support in Justice Kavanaugh's *concurrence* in *Bruen* (joined by Chief Justice Roberts) (Resp. at 15-16) but, because those statements did not appear in the majority opinion, it can be assumed the Court considered his position but a majority did not agree. Regardless, Justice Kavanaugh's concurrence, and any statements therein that depart from the majority opinion, are simply not binding on any court. *See Maryland v. Wilson*, 519 U.S. 408, 412-23 (1997) (noting that, of dicta and concurrences, "neither constitutes binding precedent"). *See also Fraser* 2023 U.S. Dist. LEXIS 82432 at *24 n.11 (giving Justice Alito's *Bruen* concurrence "no analytical weight").

Lastly, it is worth pointing out that Defendants apparently fail to recognize the logical conclusion to their position. First, Defendants argue that a waiting period merely *to acquire a firearm* is generally reasonable because permitting processes *to carry a firearm in public* are permissible. Resp. at 1-2. Second, Defendants claim specifically that a 10-day waiting period is permissible because many states have "longer than ten business days to complete required background checks" for concealed carry permitting schemes. *Id.* at 2, 16. Defendants thus place

---

[2]   https://gunowners.com/images/cases/AntonyukVHochul/Preliminary_Injc_Hearing_Transcript.pdf.

4

all their eggs into the permitting basket. But the logical conclusion to this reasoning is that Congress could justify a *waiting period* on the transfer of *all firearms* to *any person* (not just young adults) of up to *four months* (since Nevada allows 120 days for issuing a permit, *see* Resp. at 15 n.6). Defendants offer no limiting principle that would foreclose such a blatant infringement of Second Amendment rights.

### B. The Historical Record Supports Plaintiffs and Not the Government.

Defendants claim that the Second Amendment simply does not apply to adults under the age of 21. Resp. at 17. First, Defendants spill much ink in reliance on the Fifth Circuit's pre-*Bruen* opinion in *NRA v. ATF*, 700 F.3d 185 (5th Cir. 2012). Although Defendants concede that *NRA*'s applied framework was overruled in *Bruen*, and that *NRA* "does not squarely control the outcome of this case" because the panel "did not hold" that special restrictions on 18–20-year-olds were "permissible *solely* as a matter of the Second Amendment's text and history," Defendants nevertheless posit that this is "[t]he logical implication" of that decision. Resp. at 18. Defendants thus point the Court to dicta from the *NRA* case, where that panel (in a few paragraphs) concluded that the Second Amendment at the time of the Founding did not apply to those under 21 because "the term 'minor' or 'infant' — as those terms were historically understood — applied to persons under the age of 21." 700 F.3d at 200-202. But the *NRA* panel did not actually provide a single historical analogue or source restricting firearm acquisition by those under 21, relying instead on a series of law review articles and modern dictionaries about so-called "civic virtue"[3] and the "age

---

[3] Claiming there to be an early trend of disarming politically disfavored groups, the *NRA* panel hinted at Founding-era disarmament laws of various disfavored groups, such as who refused to sign loyalty oaths, which the panel alleged typified a so-called "virtuousness" theory of constitutional rights. *See NRA*, 700 F.3d at 200-01. Defendants pick up where the *NRA* panel left off, claiming that Second Amendment rights do not apply to those deemed "not 'fit to be trusted,'" and "groups historically deemed irresponsible." Resp. at 20. But at least one Supreme Court justice has explicitly rejected this premise, as did the *Bruen* court implicitly. As then-Judge Barrett

of majority." Indeed, the panel's first reference to the sort of historical analogues required by *Bruen* was "arms-control legislation … by the end of the 19th century." *Id*. at 202. But as Plaintiffs have explained in their motion, such Reconstruction-Era sources come far too late, and have no relevance to the analysis, because they do not confirm an already-established trend. ECF #3 at 6 n.2; *see Bruen*, 142 S. Ct. at 2137 ("post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.") and 2136 (cautioning "against giving postenactment history more weight than it can rightly bear.").

But more fundamentally than its sparse analysis and lack of historical analogues, the *NRA* panel asked and answered the wrong question, inquiring into "the age of majority at common law" (*id*. at 201), rather than examining the pertinent question – that is, who constitutes "the people" protected by the Second Amendment. Defendants pick up that baton, arguing that "twenty-one was the universally recognized age of majority in the Founding Era…." Resp. at 2; *see also id*. at 17.[4] But the Second Amendment does not limit its protections to those who have reached "the age

---

explained, there is no "evidence that founding-era legislatures imposed virtue-based restrictions on the right; such restrictions applied to civic rights like voting and jury service, not to individual rights like the right to possess a gun." Then-Judge Barrett noted that the "power [to disarm people who are dangerous] extends only to people who are *dangerous*" and rejected, for example, the notion that "the legislature can disarm felons because of their poor character, without regard to whether they are dangerous." *Kanter v. Barr*, 919 F.3d 437, 451, 462 (7th Cir. 2019) (Barrett, J., dissenting); *see also* at 464 (concluding that the Second Amendment's "limits are not defined by … a lack of virtue or good character"). *See also Bruen* at 2123 and n.1 (rejecting the idea of disarming people based on "perceived lack of … suitability," defining the "'suitable person' standard'" as "those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon'").

[4] Defendants provide no authority for this claim of "universal[ity]." On the contrary, Blackstone explained that, in the common law, the ages for the various privileges and duties of adulthood varied greatly, depending on the purpose. *See* 1 William Blackstone, Commentaries 463-64 (oath of allegiance (12); marrying (male, 12, female, 7 or 14); executor (17); sell lands and goods (21); entitled to a dowery (female, 9)). The Commentaries thus "underscore the difficulty of determining the definitive age of 'adulthood' at the time of the Founding and reflect an eventual

of majority," but rather protects rights of "the people" broadly.  As the Supreme Court stated in *Heller*, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.  Thus, to determine whether 18–20-year-olds are part of "the people," Plaintiffs submit that the better inquiry would be to examine early militia statutes which, without exception, *required* young adults to bear arms that they possessed at, and brought with them from, home.  ECF #3 at 8.  Defendants claim that these militia statutes are unhelpful because the Second Amendment protects a right "unconnected with militia service."  Resp. at 21 (*quoting Heller* at 582).  But Defendants miss the point.  Rather, these statutes[5] show that young adults before and during the Founding Era not only were permitted but also were *expected* to be armed – acquiring, equipping, and maintaining their own personal firearms.

In *Firearms Policy Coal., Inc. v. McCraw*, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022), another judge of this Court recently asked and answered the correct question, finding that "18-to-20-year-olds" unambiguously are part of "the people" referenced in the Second Amendment.  *Id.* at *9-10, 13 (explaining that the "Second Amendment does not mention any sort of age restriction," unlike other constitutional provisions that do, noting that other constitutional amendments (Fifth and Fourteenth) do not exclude young adults, and finding that "the Second Amendment's protections extend at least to those who constitute the militia," members of which

---

accumulation of the legal rights and responsibilities that we today associate with adulthood." *Fraser*, 2023 U.S. Dist. LEXIS 82432, at *59.

[5] There are many such statutes, but a couple stand out.  **Error! Main Document Only.***See, e.g.*, Connecticut, 1639 (requiring that "all persons shall beare Armes that are above the age of sixteen yeeres"),  https://archive.org/details/publicrecordsofc001conn/page/15/mode/1up?view=theater (at 15); Georgia, 1755 ("that every person lyable too appear and Bear Arms at any Muster," defined as "[a]ll Male Persons from the Age of sixteen too sixty years," "shall constantly keep in his House, or at his usual place of abode" a "Gun or Musquet fit for Service," https://claytoncramer.com/primary/militia/GA1755MilitiaLaw.pdf (at 11).

were "required … to arm themselves…."). Indeed, Defendants' curious notion that young adults were not part of "the people" during the time of the Revolution and Founding Era certainly would have been foreign to, for example, Alexander Hamilton, who was just turning 18 at the same time he was advocating for revolution as a widely read pamphleteer,[6] and thereafter being commissioned in the Continental Army shortly after turning 19.[7]

Defendants are quick to cite this Court's prior passing reference to what "the Fifth Circuit found" in *NRA* in *Mance v. Holder*, 74 F. Supp. 3d 795, 805 (N.D. Tex. 2015). Resp. at 17. But that reference appears to have been merely for illustrative value of the then-prevailing Second Amendment methodology, as *Mance* dealt with quite different statutes "relat[ing] to the buying, selling, and transporting of handguns over state lines." *Id.* at 799. Moreover, to the extent that the *NRA* panel's decision purported to identify some "historic traditions of age restrictions," they were not the broad and enduring Founding-Era historical tradition of the sort that *Bruen* requires. Neither this Court nor the Fifth Circuit has analyzed the issue under the *Bruen* framework.[8]

Finally, Defendants seek to minimize a series of recent district court decisions which have applied *Bruen* to invalidate restrictions that apply to young adults (carry, but not purchase). Resp. at 22-23. But a court's statement limiting its decision to the issue at hand is hardly a reason to

---

[6] https://oll.libertyfund.org/title/appleby-the-revolutionary-writings-of-alexander-hamilton.
[7] https://www.history.army.mil/books/revwar/ss/hamilton.htm.
[8] Defendants claim that "Plaintiffs appear to accept that legislatures may impose some age-based restrictions on the commercial sale of arms, as they do not appear to contend that the Second Amendment secures the right to access arms to those under the age of eighteen." Resp. at 19. On the contrary, the question is not what "restrictions … legislatures may impose," but rather the proper scope of the Second Amendment's protections, as originally understood during the Founding Era. Indeed, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller* at 634-35.

discount the persuasive nature of its analysis regarding the basic concept of who constitutes "the people" to whom an enumerated right applies.

In sum, there is no precedent that binds this Court's hands in deciding the novel issues presented in this case. Moreover, Defendants have not proffered *even one* historical analogue from the Founding Era that in any way regulated or limited the acquisition of firearms by those 18-20 years old. Rather, Defendants offer only the offensive theory that young adults are generally untrustworthy, and claim that governments may disarm such disfavored groups. Resp. at 20-21. But this notion is implicitly foreclosed by *Bruen* itself, and was expressly repudiated by Justice Barrett. *See supra*, n3. Having entirely failed to meet their burden under *Bruen* to provide historical sources to rebut the presumption (favoring Plaintiffs) that young adults have the same rights as the rest of "the people," the Challenged Provisions must be enjoined.

### III.    Defendants Fail to Undermine Plaintiffs' Clear Showing of Irreparable Harm.

Arguing that Plaintiffs have not shown irreparable harm, Defendants first recycle their claim that any harm to McRorey and Flores is (or soon will be) in the past. Resp. at 23-25. Second, Defendants claim that "any future firearm purchases" are "not sufficiently imminent to support the extraordinary remedy of preliminary injunctive relief." *Id.* at 25-26. Third, Defendants appear to argue that there is no harm to GOA and GOF's members and supporters, as any delay for any *specific* member or supporter purchasing any *specific* firearm might be over by the time this Court decides Plaintiffs' motion. *Id.* at 26 n.15. But again, this Court need not address any of Defendants' "gotcha" arguments, as McRorey already has attempted to acquire a second firearm today, May 26, 2023, but was placed in a delay status (Exhibit A at ¶¶5-8), and thus the irreparable

harm to him is ongoing.[9]   As none of Defendants' arguments about irreparable harm apply to McRorey's *subsequent* firearm purchase and his clearly *ongoing* irreparable harm, and because Defendants offer no other argument on the issue, this Court should conclude irreparable harm exists.

### IV.    Defendants Offer Nothing to Shift the Balance of Equities in Their Favor.

Defendants offer the conjecture that "public safety" will be harmed if the statute is enjoined, on the theory that "the Act's enhanced background check provisions have succeeded in preventing … more than 160 firearm transactions…."  Resp. at 27.  Of course, the federal government likely would catch innumerable 'bad guys' if courts dispensed with the Fourth Amendment's warrant requirement, but catching bad guys does not justify constitutional violations.   Since the challenged statute took effect on June 25, 2022, there have been approximately 28 million NICS checks conducted (not counting June of 2022 or May of 2023)[10] and, according to Defendants' report, at least 89,000 of them have required enhanced background checks for young adults (meaning a denial rate smaller than 0.2 percent).[11]  Moreover, Defendants (i) offer no specifics as to what crimes these persons would have committed had they successfully acquired long arms, (ii) do not claim that these persons otherwise have not been able to acquire firearms anyway, and (iii) do not provide the reasons why these individuals were denied.  As Plaintiffs have explained, the FBI *admits that it is wrong* as to a significant percentage of denials. Compl. ¶16 n.7.

---

[9] Nor will the irreparable harm to Plaintiffs end if McRorey obtains another firearm, as members of GOA and GOF will continue being irreparably harmed until the Challenged Provisions are enjoined.

[10] https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf.

[11] https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/14/fact-sheet-president-biden-announces-13-new-actions-to-reduce-gun-violence-by-maximizing-the-benefits-of-the-bipartisan-safer-communities-act/.

Next, Defendants theorize, again non-specifically, that young adults are disproportionately the perpetrators of "violent crime resulting in arrests nationwide…."  Resp. at 27.  But as Plaintiffs have already noted, this same age group correspondingly and disproportionately represents the *victims* of violent crime, and thus is in need of firearms for self-defense.  Compl. ¶56.  Moreover, it is almost always (86 percent[12]) the case that *handguns* are used in "violent crime," whereas this case involves *long guns* (rifles and shotguns), the only firearms that young adults may lawfully acquire from federally licensed dealers.[13]  Tellingly, this case was not brought by criminals, but by two individuals with perfectly clean backgrounds, eligible under both state and federal law to possess firearms.  *See also* ECF 1-8 (Declaration of Hayden Haines).  Defendants cannot possibly use speculation about potential crimes by others as justification for infringing Plaintiffs' rights.  In fact, as to McRorey, the FBI reports that *he just passed* an "enhanced background check" nine days ago.  *See* ECF 14-1 at 3.  Certainly, no equitable considerations favor the government as to him.

Lastly, Defendants demur that Plaintiffs' allegation that the equities weigh in their favor "presumes that Plaintiffs will prevail on the merits," and correspondingly that, if *Defendants* are likely to prevail, then the equities support them.  But all Defendants have done is offer the flip side of the same coin, apparently agreeing with Plaintiffs that the merits analysis largely controls the balance of the equities in cases such as this.  Indeed, it would be quite stunning for a court to find

---

[12] https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF.

[13] Finally attempting to provide specifics, Defendants posit that two recent mass shootings were perpetrated by 18-year-olds (Resp. at 5), but fail to acknowledge that both criminals were eligible to purchase firearms and would not have been stopped by the enhanced background check.[13]  In fact, after reviewing a list of 190 so-called "mass shooters," Plaintiffs were unable to locate a single one who would have been stopped by the challenged statute.  *See generally* https://www.theviolenceproject.org/mass-shooter-database/.

a statute likely to violate the Constitution, but then to declare there to be some great public interest in its continued enforcement.

V.        **The Appropriate Scope of Relief.**

Finally, Defendants argue that, even if the Court were to issue a preliminary injunction, any relief therein granted should be "no broader than necessary to remedy any demonstrated harms of the *individual Plaintiffs* in this case." Resp. at 28 (emphasis added). Curiously relying on (but not further explaining) the text of Fed. R. Civ. P. 65, Defendants claim that the members and supporters represented by GOA and GOF cannot benefit from any relief (Resp. at 29), even though the entire point of representational standing (recognized by both the Supreme Court and the Fifth Circuit) is to allow organizations such as GOA and GOF to litigate in the place and on behalf of their members and supporters. Indeed, Defendants' claim directly conflicts with the Supreme Court's statement that "'individual participation' is not normally necessary when an association seeks … *injunctive relief* for its members…." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (emphasis added).

Defendants claim that, in order to have injunctive relief apply to members and supporters of GOA and GOF (who are being represented by GOA and GOF in this case), the entities must "provide … records of their memberships…." Resp. at 29. But that would require the very "individual participation" the Supreme Court explicitly has said is not required, would skirt the edge of *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), and would represent an entirely novel standing requirement that at least one other federal district court has flatly refused to impose. *See Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at *12-14 (N.D. Ill. June 9, 2021) (considering a motion for preliminary injunction, and finding that "[o]nly one qualifying member is needed to satisfy [representational standing], and he need not be named," that descriptions of

12

and declarations from various members "suggest[s] that ISRA has a number of members through which it can claim standing," and "it will not be necessary to establish individualized facts for every affected member of the organizational plaintiffs").

Even so, Plaintiffs GOA and GOF have specifically established that they have at least one qualifying member or supporter in 37 of the 42 states where young adults lawfully may acquire firearms.  ECF #1-1 at 9.  Moreover, each of these persons has announced plans to purchase a firearm, whereupon he or she will be delayed by the challenged statute and thus be irreparably harmed.  *Id.*  A federal district court recently granted a broad injunction on similar facts.  *See West Virginia v. United States EPA*, 2023 U.S. Dist. LEXIS 64372, *79 (D. N.D. Apr. 12, 2023) (granting an injunction as to 24 States who were named in the lawsuit).

As the *Marszalek* court explained, it is unnecessary (and indeed would be entirely impracticable) for GOA and GOF to provide a declaration for every one of the organizations' members and supporters who have been, currently are being, and will be irreparably harmed by the challenged statute, specifying to Defendants' satisfaction the specific place, exact date, and precise time at which each represented individual intends to acquire a particular firearm.  Nor do Plaintiffs need to name every such person, because that would be the "individual participation" that is not required.  Rather, should this Court grant the relief sought, it should do so in a way that the Plaintiffs in this case are granted the full scope of the relief being sought (*i.e.*, in a way that fully stops the harm to the members and supporters on whose behalf they litigate).

## VI.    In Responding to Plaintiffs' Motion, Defendants Relied on Information that Federal Law Required the Government to Have Previously Destroyed.

Defendants' response to Plaintiffs' motion included a sworn declaration (ECF # 14-1) which describes an FBI examiner's check of NICS records which federal law required the government to have already destroyed.  Specifically, 18 U.S.C. Section 922(t)(2) requires that,

"[i]f transfer or receipt of a firearm would not violate" the law, "the system shall (A) assign a unique identification number to the transfer; (B) provide the licensee with the number; and (C) destroy ... all records of the system relating to the person or the transfer."  Implementing that statutory requirement, 28 CFR § 25.9(b) states that "[t]he FBI will maintain an automated NICS Audit Log of all incoming and outgoing transactions that pass through the system."  Within that Audit Log is included "identifying information about the prospective transferee...."  *Id.* at (1). Regarding that "identifying information," Audit Log records of "denied" transactions are maintained for 10 years, and information about "delayed" or "open status" transactions is maintained for "not more than 90 days."  *Id.* at (b)(1)(i) and (ii).  Importantly, however, with respect to "allowed transactions," "**all identifying information** submitted by or on behalf of the transferee will be **destroyed within 24 hours after the FFL receives communication** of the determination that the transfer may proceed."  *Id.* at (b)(1)(iii) (emphasis added).

Defendants' Declaration of David Alan Fazzini, ECF #14-1, states that Plaintiff McRorey's attempted purchase of a firearm was made "[o]n May 12, 2023, at 10:36 a.m. (Eastern time)...." *Id.* at 2.  The FBI's declaration further states that "no prohibiting or potentially prohibiting information existed," leading to a "'Proceed' status."  *Id.* at 3.  Finally, the FBI's declaration states that "[o]n May 17, 2023, at 10:09 p.m. (Eastern time), the FFL ... retrieved the 'Proceed' status from the NICS."  In other words, the 24-hour period during which all of McRorey's information submitted to NICS had to be destroyed, as required by 28 CFR § 25.9(b)(1)(iii), commenced no later than 10:09 p.m. on May 17, 2023.  Under the regulation, then, all "identifying information" about McRorey's transaction **should have been deleted** by NICS by 10:08 p.m. on **May 18**, 2023. But apparently that did not happen.

14

Instead, the FBI's examiner further reports in his declaration that, "[o]n **May 22,** 2023, I conducted a review of the NICS audit log for an 'Ethan McRorey,'" resulting in a "match[] to NTN 102Y31D9W," for "the prospective transfer of a long gun to an individual named Ethan McRorey who was born in 2003 and resides in Texas." Emphasis added. The examiner's May 22 review was **four days after** the May 18 date on which McRorey's personal information should have been deleted from the NICS Audit Log in accordance with 28 CFR § 25.9(b)(1)(iii).

Certainly, Defendants were entitled to inform the Court generally that McRorey's background check had been approved, and to argue that his claim is moot. However, it also may be that Defendants' publication of this information on the public record was not authorized by 28 CFR § 25.9(b)(2), which states that "[i]nformation in the NICS Audit Log pertaining to allowed transactions" like McRorey's "may be accessed directly only by the FBI" and (i) "only for the purpose of conducting audits of the use and performance of the NICS," or (ii) "a violation or potential violation of law or regulation," or (iii) "shared with ATF in Individual FFL Audit Logs as specified in § 25.9(b)(4)." The government neither filed its declaration under seal nor sought this Court's permission to suspend this regulation limiting its uses of NICS information.

Based on Defendant's unabashed declaration, it is hardly surprising that Plaintiffs' object to Defendants' demand to release a list of members in exchange for an injunction that applies to those members. *See* Resp. at 29. Defendants could, for example, monitor such persons using the NICS Audit Log information that Defendants apparently are not destroying as required, and thereby create the sort of national registry of guns and gun owners that federal law explicitly prohibits. *See* 18 U.S.C. Section 926(a)(3).

**Conclusion**

For the reasons stated, this Court should grant Plaintiffs' motion.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
E-mail: stephen@sdslaw.us

Brandon W. Barnett
Texas Bar No. 24053088
Barnett Howard & Williams PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
E-mail: barnett@bhwlawfirm.com

David G. Browne*
Spiro & Browne, PLC
2400 Old Brick Road
Glen Allen, VA 23060
804-573-9220 (T)
804-836-1855 (F)
E-mail: dbrowne@sblawva.com
*Admitted Pro hac vice*

*Counsel for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be filed with this Court's CM/ECF system, which generated a notice and provided a copy of the foregoing to all counsel of record.

Dated: May 26, 2023.

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh